**Dorothy KROPP, as Administratrix of the Estate of Charles R. Kropp, Deceased, Plaintiff,**

v.

**DOUGLAS AIRCRAFT CO., Inc. and the United States of America, Defendants.**

No. 66–C–562.

United States District Court,
E. D. New York.

June 25, 1971.

Theodore E. Wolcott, New York City, for plaintiff; Howard G. Law, Jr., New York City, of counsel.

Crowe, McCoy & Agoglia, Garden City, N. Y., for Douglas Aircraft Co., Inc.; Harold V. McCoy, Morris Zweibel, New York City, of counsel.

Edward R. Neaher, U. S. Atty., Eastern Dist. of New York, for the United States; by Philip Silverman, Trial Atty., U. S. Dept. of Justice.

ZAVATT, District Judge.

This is an action to recover damages for the death of Charles R. Kropp (Kropp), an employee of Grumman Aircraft Engineering Corporation (Grumman), which occurred over the high seas (approximately fifty miles East of Montauk Point, Long Island, New York) when he exited an A3A aircraft, manufactured by the defendant Douglas Aircraft Co., Inc. (Douglas), owned by the defendant United States of America (the Government) and piloted by one Donald Runyon (Runyon), another Grumman employee. The several claims against the Government are grounded in the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1291, 1346, 1402, 1504, 2110, 2401, 2402, 2411, 2412, 2671 et seq., and the Death on the High Seas Act (DOHSA), 46 U.S.C. §§ 761–768. The claim against Douglas is based upon claims of negligence in design and construction and breach of warranty. Plaintiff alleges in its amended complaint that the aircraft was not only owned by the Government but was also operated and controlled by it at the time of the fatal accident and throughout all of the period prior thereto, during which the said aircraft was based at the airfield at Calverton, Long Island, New York, (hereinafter referred to as Peconic), owned by the Government and leased to Grumman.

The Navy and Grumman entered into Contract No. w 63–0540–b (the contract) on June 27, 1963 for the term July 1, 1963 through June 30, 1966 (Ex. 1), pursuant to which the Navy delivered 31 of its aircraft to Grumman, none of

which was an A3A aircraft. By memorandum dated February 6, 1964 (Ex. 4-A), the subject A3A was furnished by the Navy to Grumman for the period ending April 1, 1964 pursuant to the terms of the contract. The contract refers to "the Contractor's possession and prospective use of such aircraft." The contractor agreed to "provide adequate storage for Government Furnished Property in the custody of the Contractor * * * "; to maintain the aircraft and equipment "in accordance with the standard Naval Aircraft Maintenance Program, as administered and directed by the cognizant reporting custodian" and to return said property "to the Government in the same condition as when received by the Contractor; except for (i) normal wear and tear * * * No costs incurred in the performance of this bailment contract shall be reimbursed to the Contractor hereunder" (Ex. 1, sections 2, 3, 5).

The aircraft so furnished to Grumman were to be used by it to "perform the services which are called for in the projects agreed to between the Contractor and the Government," which projects, "may be in the form of formal contract, or by exchange of letters or telegrams" (Ex. 1, section 4). "Upon delivery into the custody of the Contractor, Government Furnished Property hereunder shall be governed by the terms and conditions of this contract while and so long as it is in the custody of the Contractor * * * " (Ex. 1, section 5(c)). The bailment of the A3A to Grumman pursuant to the contract was extended to May 15, 1965 (Exs. 4-B, 4-D). The contract's projects related to the development and evaluation of "the E-2A AEW System," i. e., the radar and long range tracking system being tested by Grumman for use in the E-2A aircraft (Ex. 4; 297*). The A3A was being used, pursuant to the contract, as a target for the evaluation of said radar equipment (Ex. 4-B). It was hangared by Grumman at Peconic. Prior to the fatal accident, it had made thirty flights out of Peconic, all piloted by various employees of Grumman, including Runyon (Ex. HH).

Runyon was a retired Navy Commander with extensive experience as a flight engineer and pilot of military aircraft. During his naval career, spanning thirty years, he first served as a plane captain (mechanic); then as a pilot serving aboard aircraft carriers, including the Enterprise, Yorktown, Lexington, Saratoga and Bunker Hill during World War II; a test pilot at the Naval Air Test Center, Patuxent River, Maryland; a test pilot at the Naval Advisory Committee of Aeronautics, Moffet Field, California; a pilot at a development squadron at Atlantic City, New Jersey. When he retired in July 1963, he had accumulated 7,000 hours of flight time in virtually every type of naval aircraft, including 75 to 80 hours in the A3A.

In August 1964 he became assistant to the head of the Grumman flight testing department and was designated as a test pilot a few months thereafter (276), in which capacity he was serving on the date of the accident. During employment by Grumman he had re-qualified as an A3A pilot and it is not disputed that he was qualified and Navy approved to pilot the A3A (Exs. 9, 10, 11).

### The Fatal Flight.

On the morning of January 27, 1965, the A3A was to be piloted by Runyon and flown as the target for a radar test to be conducted by Grumman personnel aboard an E-2A. The E-2A is a highly sophisticated craft, designed to accommodate a 15-man crew and to be used as a central intelligence center (CIC) to detect airborne aircraft. The A3A was to be the target because its surface area approximated that of planes which the E-2A radar equipment would hopefully detect (1122). The courses, positions and altitudes of the A3A were to be as directed from the E-2A. The flight plan called for the A3A to take off from

---

* Pages in parentheses refer to trial transcript.

Peconic and the E–2A to take off from Bethpage. For this non-tactical A3A flight, a minimum of two "flight crew" members is required (Exs. 12–C, 19). (There will be further reference *infra* to "flight crew" members.)

The only plane captain of this A3A, approved by the Navy as of January 27, 1965, was John Young (Young). It was not disputed at the trial that Young was qualified and approved by the Navy as a flight crew member of the A3A. Grumman was training Kropp to become a plane captain. Young was to accompany Runyon on the flight. In fact, he was on his way to "suit up" after having met Runyon in the vicinity of the craft. While Runyon was signing requisite forms and filing a Flight Plan with Grumman's Flight Operations at Peconic, Young went to "suit up." On his way, his foreman, Mr. Schick (a Grumman employee) called him to his office. Following a conversation, Young did not go on the flight (2051–52) although he was at the flight line prior to the plane being boarded.

When Runyon was ready to board the A3A, Kropp was at the plane. Runyon knew Kropp as a Grumman maintenance employee who had been aboard the A3A with Young as part of his training as a plane captain on two occasions when Runyon piloted the plane (330–333). Although there is no testimony in the record, it is reasonable to infer that Runyon learned that Young was not to accompany him on this flight; that Kropp was being substituted for Young.

Runyon was the first to enter the plane. He proceeded to the pilot's seat and strapped himself in. In this position he could not close either hatch door or have personal knowledge as to whether they were properly secured. Nor did the instrument panel contain any device to indicate whether the lower hatch was locked. Before taxiing for take off, Runyon was required to fill out a check-off list on which one item is the position of the lower door. It was Kropp's duty to close and lock both hatches. The man who directs the taxiing of a plane from its standing position is called "the plane director" (527). When he signals the pilot of an A3A that the plane is ready to go, that signal means to the pilot (as it did to Runyon on this flight) that the lower door is in place and locked (524). Runyon did not remember what he saw Kropp do prior to takeoff (520). He did testify as to the normal procedure preceding takeoff, as far as the check list and hatches are concerned. The other person aboard assists the pilot with the check list and indicates to him that the lower door is closed and locked. Runyon testified that Kropp "indicated to me * * * that the hatches were up, locked and closed" and that this was part of the normal procedure (541).

Young testified that, from outside the plane, he "closed" the lower door (607). It "was half latched and it dropped at the trailing edge approximately an inch * * * or an inch and a half." "The door dropped down a little from the external skin," i. e., it was not flush with the under part of the fuselage. In order to be raised and flush it has to be locked (608). Young could have locked it from the outside by means of the "external handle" (the operation of which is explained *infra*). He did not do so because the regular procedure was to leave it "up to the plane captain in the aircraft to secure his aircraft" (608, 609, 1875). He saw the door go up and fair with the fuselage. From the outside he could not tell whether the door went into the final locked position (1876).

The A3A took off from Peconic at approximately 10 A.M. with Runyon seated in the forward left or pilot's seat and Kropp seated to his right in the bombardier-navigator's or flight crewman's seat (359). Runyon proceeded in an eastwardly direction and was climbing to attain an ultimate altitude of 40,000 feet (1139). His air speed was approximately 300 knots (360 M.P.H.). At from 5,000 to 7,000 feet, the pressurization system was turned on but failed to function, at first. Runyon "recycled" the switch (turned it off and on) as a result of which the pressurization sys-

tem began to function at approximately 14,000 feet and continued to function throughout the flight. There was no malfunction of the pressurization system from that time on and, accordingly, I refuse to make the plaintiff's requested finding that this system malfunctioned, with its implication that this was a proximate cause of the accident. (Ironically, if the cabin had not been pressurized, the accident could not have occurred and, presumably, Kropp would be alive today.)

One of the panel instruments was a navigational device (TACAN) which enables the pilot to determine his distance from a given ground point, by means of a "lock-on" device, which automatically measures the distance from the plane to the fixed ground point. When the TACAN indicated that the plane was 175 miles from Riverhead, Runyon knew from his experience that he was only 50 to 60 miles from that ground point. He mentioned to Kropp over his mike that the TACAN was not functioning properly. Although not requested or ordered to do anything, Kropp said that he was going to go aft for a check. He left his seat with his helmet, oxygen mask and parachute on and went to the after section of the cockpit. In the after section of the cockpit there are numerous dials and indicators and, apparently, it was these items that, initially, Kropp went aft to check. Runyon knew that the TACAN circuit breakers, which are located in the bulkhead of the companionway, had been checked as part of the pre-flight check and that they had all been in place (660–668). He thought that Kropp knew something about the plane that he, Runyon, did not know. Although Runyon could not see Kropp, they were in communication over the intercom system (ICS). After a short period of time, Kropp stated that everything aft appeared O.K., that he was going into the companionway to check the circuit breakers and that he would have to depressurize. Runyon said over the ICS, "Don't do that," to which Kropp did not answer. Runyon

glanced at his left console panel to make sure that Kropp was not touching the pressure switches and placed his hand over the switches to be sure that Kropp would not depressurize the cabin (Exhibit 18, Tr. 656–670).

The proper procedure for depressurizing an aircraft during a non-emergency situation, to enable a crewman to enter the companionway during flight, is to first descend to an altitude at which the person entering the companionway may do so without the need of oxygen equipment and then to depressurize the cockpit in order to prevent explosive decompression (822).

Two or three seconds after Runyon ordered Kropp not to depressurize, he felt the force of explosive decompression which rendered him shocked and dizzy. In response to his call to the tower at Peconic, a plane already airborne notified Runyon that the lower door of his A3A was cracked, i. e., open about one to one and one-half inches. Apparently, after Kropp exited from the plane, the slip stream pushed the lower door back to its half-latched position.

The plaintiff originally claimed negligence in the search and rescue procedures. The evidence negatived any such negligence and the plaintiff has not requested a finding of negligence on this score. Therefore, no reference is made to the evidence in this regard adduced at the trial.

## JURISDICTION

■ Section 1 of the Death on the High Seas Act (DOHSA), 46 U.S.C. § 761, grants a right of action for damages to the personal representative of one whose death "shall be caused by wrongful act, neglect, or default occurring on the high seas beyond a marine league" from the shore of any United States territory. The right of action so granted is limited, however, to the extent that suits under the Act are exclusively within the jurisdiction of federal admiralty courts. Safir v. Compagnie Generale Transatlantique, 241 F.Supp. 501 (E.D.

N.Y.1965); Wilson v. Transocean Airlines, 121 F.Supp. 85 (N.D.Cal.1954).

In determining whether a tort claim comes within the jurisdiction of a federal court sitting in admiralty, the crucial factor appears to be the locality of the tort, i. e., where the tort occurred. If the tort occurred on navigable waters (or, for purposes of the DOHSA, on the "high seas"), the claim comes within the jurisdiction of admiralty courts. Weinstein v. Eastern Airlines, Inc., 316 F.2d 758 (3d Cir. 1963), cert. denied, 375 U.S. 940, 84 S.Ct. 343, 11 L.Ed.2d 271 (1964); Montgomery v. Goodyear Tire & Rubber Co., 231 F.Supp. 447, 454 (S.D.N.Y.1964). Under this so-called "locality" test, the tort is deemed to have occurred at the place of injury, rather than the place where the tort had its inception. In other words, admiralty jurisdiction in tort depends upon the situs of the tort, not upon its character or how it came about. Weinstein, *supra*, 316 F.2d at 762–763; Wilson, *supra*, 121 F. Supp. at 92.

Despite the wide acceptance of the "locality" test, a minority of cases adhere to what has been termed the "locality plus" test. Under the latter standard, admiralty jurisdiction in tort cases depends upon two factors: (1) the tort must occur on navigable waters; (2) the tort must have a maritime connection or arise from the breach of some maritime duty. Chapman v. City of Grosse Point Farms, 385 F.2d 962 (6th Cir. 1967). As will appear, *infra*, under either the "locality" test or the "locality plus" test, the instant case satisfies the requirements for admiralty jurisdiction under the DOHSA.

█ In the instant case, given that plaintiff's decedent exited the aircraft approximately fifty miles off the coast of Long Island "beyond a marine league" from shore (and the court so finds), the application of the "locality test" would seem to dictate that the case comes within the court's admiralty jurisdiction under the DOHSA. Nevertheless, cases involving airplane accidents over water reflect a divergence of opinion on the question of whether such accidents in fact occur on the high seas or navigable waters of the United States, as required for admiralty jurisdiction. It is clear that tort claims for wrongful death arising out of the crash of an aircraft *into* navigable waters beyond a marine league from shore are within the terms of the DOHSA. Weinstein, *supra;* Krause v. Sud-Aviation, Societé Nationale de Constr. Aero., 301 F.Supp. 513 (S.D.N.Y.1968), aff'd, 413 F.2d 428 (2d Cir. 1969); King v. Pan American World Airways, 166 F.Supp. 136 (N.D. Cal.1958), aff'd, 270 F.2d 355 (9th Cir. 1959), cert. denied, 362 U.S. 928, 80 S. Ct. 753, 4 L.Ed.2d 746 (1960); Fernandez v. Linea Aeropostal Venezolana, 156 F.Supp. 94 (S.D.N.Y.1957); Higa v. Transocean Airlines, 124 F.Supp. 13 (D.C.Hawaii 1954); *Wilson, supra;* Lacey v. L. W. Wiggins Airways, Inc., 95 F.Supp. 916 (D.Mass.1951).

In *Weinstein, supra,* an airplane en route from Boston to Philadelphia crashed into the waters of Boston Harbor, *within* one marine league from shore. The court, going further than the cases just cited, held that, since navigable waters include both the high seas and waters navigable in fact, the navigable waters of Boston Harbor were within the territorial jurisdiction of admiralty. 316 F.2d at 761. It is also instructive to note that the court in *Weinstein* stated that, even if a "locality plus" test were used, the case would still be cognizable in admiralty. The court reasoned that, because over-sea air travel has become as common as travel by ship, the dangers inherent in airplane crashes on the high seas are similar to those existing when a ship sinks or when two vessels collide, all of which situations should come within admiralty tort jurisdiction. The implication here is that the maritime connection required by the "locality plus" test can be found in the mere fact that the accident in question occurs on navigable waters. 316 F.2d at 763. Applying the reasoning of *Weinstein* to the instant case, it similarly appears that, because the decedent fell into

the "high seas," the "locality plus" test is satisfied.

In addition to cases holding airplane *crashes* into navigable waters to be within admiralty tort jurisdiction, under both the "locality" and "locality plus" tests, there is also authority for the recognition in admiralty of wrongful death actions arising out of aviation mishaps in the airspace *above* the high seas. National Airlines, Inc. v. Stiles, 268 F.2d 400 (5th Cir. 1959); D'Aleman v. Pan American World Airways, 259 F.2d 493 (2d Cir. 1958); Trihey v. Transocean Air Lines, Inc., 255 F.2d 824 (9th Cir. 1958); Notarian v. TWA, Inc., 244 F. Supp. 874 (W.D.Pa.1965); Noel v. United Aircraft Corp., 204 F.Supp. 929 (D.Del.1962), aff'd, 342 F.2d 232 (3d Cir. 1965).

In D'Aleman v. Pan American World Airways, *supra,* an action under the DOHSA for wrongful death allegedly due to shock induced by the pilot's announcement of engine trouble, the Second Circuit, affirming a judgment for the airline, said:

> "The statutory expression 'on the high seas' should be capable of expansion to, under, or, over, as scientific advances change the methods of travel. The law would indeed be static if a passenger on a ship were protected by the Act and another passenger in the identical location three thousand feet above in a plane were not. Nor should the plane have to crash into the sea to bring the death within the Act * * *." 259 F.2d at 495.

*See* Lavello v. Danko, 175 F.Supp. 92 (S.D.N.Y.1959).

In light of the reasoning of the cases discussed, it would appear that, in the instant case, whether the tort is deemed to have occurred in the airspace over the high seas (i. e., at the moment when the decedent exited the plane) or on the high seas (i. e., at the point of impact with the water), the exercise by this court of admiralty jurisdiction under the DOHSA is clearly warranted.

■ An action for wrongful death, based upon an alleged breach of warranty, is cognizable under the DOHSA. *Weinstein, supra; Krause, supra; Montgomery, supra;* Middleton v. United Aircraft Corp., 204 F.Supp. 856 (S.D. N.Y.1960). *See* Sevits v. McKiernan-Terry Corp., 264 F.Supp. 810 (S.D.N.Y. 1966).

■ Suits maintainable against a private person based on the DOHSA may similarly be brought against the Government by virtue of the Federal Tort Claims Act, United States v. Gavagan, 280 F.2d 319 (5th Cir. 1960), cert. denied, 364 U.S. 933, 81 S.Ct. 379, 5 L.Ed. 2d 365 (1961); Blumenthal v. United States, 189 F.Supp. 439 (E.D.Pa.1960), aff'd, 306 F.2d 16 (3d Cir. 1962); Moran v. United States, 102 F.Supp. 275 (D.Conn.1951), unless the suit comes within the exceptions to that Act, as to which the Government has not waived its sovereign immunity.[1]

■ The court holds that it has jurisdiction of the plaintiff's claim against Douglas based upon negligent design and construction and breach of warranty. As to the claims against the Government, the court holds that it has jurisdiction, unless the acts or omissions of the Government come within the exceptions to jurisdiction under the Federal Tort Claims Act, discussed *infra.*

### The Design and Construction of the A3A.

Since negligence in design and construction is one of the basic grounds

---

1. § 2680. *Exceptions*

The provisions of this chapter and section 1346(b) of this title shall not apply to—

(a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

upon which the plaintiff seeks to recover against both defendants, it is appropriate to trace the history of the A3A from the negotiations between the Government and Douglas, culminating in the contract between them for the production of an all-weather heavy attack, land-based, shipboard-based aircraft capable of carrying an atomic bomb, through its design and construction.

In 1947, the Navy commenced discussions with Douglas' Chief Engineer concerning its desire to obtain a jet-propelled bomber capable of carrying an atomic bomb and of taking off from and landing on a Navy carrier. This was to be an aircraft of higher performance than its AJ bomber (a propeller-driven aircraft) and one of high performance comparable to that of the B-47. Because the mission of the contemplated aircraft was to carry and deliver an atomic bomb, which must be armed while the aircraft is in flight, access from the cockpit to the bomb bay was a sine qua non.

The particular mission of a military aircraft, of necessity, determines many of its design features. For the plane must be so designed and constructed as to be capable of performing its special mission. As Mr. Leo Devlin, Douglas' Chief Designer during the design and construction stages of the A3A, testified:

"Well you try to do the best job for the purpose intended. You have to watch reliability, safety, performance * * * Designing a plane is a compromise from start to finish. You've got to take all things into account and do the best job that you can." (4610)

Safety is one of the design features and, as such, is governed by these general design principles. It would be highly desirable, for example, that a plane such as the A3A have a "back-up system," (a duplicate mechanism for each operating part of the plane) in an attempt to insure 100% reliability of the plane's systems. However, weight and size are vital considerations, particularly in military craft. Every one pound of increased weight of an airplane translates into six pounds on the over-all configuration, for increased weight increases the wing-load, requires a greater wing span and a heavier fuel load for the predetermined non-refueling flight range of the craft. For these and a variety of other reasons, back-up systems (although desirable from the standpoint of safety) are not feasible in every instance in the design and construction of a military craft such as the A3A. This is not to say that designers are unconcerned with safety. Rather, they attempt to design as safe a plane as possible within the scope of its mission. The dealings between the appropriate agency of the Government and the designer and manufacturer of the plane can be analogized to the person who orders a tailor-made suit and the tailor. The designing of a combat plane is a lengthy process covering approximately five years from the concept of the plane to its manufacture for production and use (740). The design of such a plane begins rather informally with an idea or suggestion which may emanate either from the manufacturer or the Government—usually the latter. The gamut of plane design and construction runs from idea to design to mock-up to prototype to test work and culminates in a production craft. Along this road, many modifications and changes are suggested and considered; some are accepted; some are rejected. But there comes a time when the design is "frozen" and production begins. The order to freeze the design, in the instant case, was that of the Chief of Naval Operations.

The initial studies indicated that the proposed A3A (equipped for its intended use) would weigh 200,000 pounds—far too large and heavy to land and be hangared on the CVB Navy carriers (the Forrestal class) and smaller Navy carriers (4584-85). Navy studies reduced the weight to approximately 130,000 pounds. Through further studies, Douglas was able to reduce the weight of the plane, so equipped, to approximately 70,000 pounds. Such a plane would be able to operate off CVB class carriers as well

as smaller carriers in the Navy fleet (4585). Reducing the weight from 130,-000 to 70,000 pounds necessitated the combination of functions wherever possible. For example, since access from the cockpit to the bomb bay was an absolute necessity, a companionway for such access was designed to also serve as a means of normal entry and exit and emergency escape from the plane (4585–86). All possible means of emergency escape, including ejection seats, were considered by the Government and Douglas. The use of ejection seats in an A3A to be manned by a crew of three, was rejected because (1) it would have increased the translated weight by 3,000 pounds over the weight of an escape chute; (2) the chute system was considered simpler and more reliable (4604); (3) the state of the art was such, when the A3A was being designed and constructed, that no three place ejection system was then feasible and, in fact, "had never been done." (4606, 4601–10).

Following discussions between the Government and Douglas for a period of approximately one and one-half years, and in 1949, the parties negotiated a contract for the design and construction of two prototype aircraft designated X–A3D–1. Before they were built, mock-ups were constructed. These are scale model replicas of the actual systems to be used, which are tested to prove the general concept of the design (4592) and are built after the detailed specifications (Exhibit Q) have been prepared and approved (4594). A Mock-up Board, consisting of Navy specialists, was convened by the Navy to inspect these models. Following the report of this Board, the two prototypes were built pursuant to the Exhibit Q specifications.

Douglas, then the Navy, conducted test flights of these prototypes. Thereafter, they were subjected to full-scale testing (suitability tests) by the Navy at its naval facility at Patuxent River, Maryland. The purpose of the suitability tests is to determine whether the prototypes are suitable for Navy use.

Two subsequent contracts for production of the A3A were entered into—one for approximately 12 (the detailed specifications of which are Exhibit R) and the other Number NOAS 52–981, Exhibit 61), for approximately 38 such planes (the detailed specifications of which are Exhibit S). The A3A involved in the instant action was produced pursuant to Exhibit 61 and bears the Navy designating number 135412.

The A3A was delivered by Douglas to the Navy on August 30, 1955 and flown in Navy service during a period of nine years before it was delivered on January 24, 1964, to the "custody" of Captain Harold Vita (Vita), the representative of the Bureau of Weapons of the Navy (BUWEPS Rep.) stationed at the Bethpage plant of Grumman (Exhibit 5). Vita's function was to supervise all contracts between the military forces and Grumman and, as such, was the local Navy custodian of the aircraft.

This aircraft received considerable attention (in addition to many different types of inspection), including one overhaul, interim rework, repair, in-service repair, and several progressive aircraft reworks over the period from August 30, 1955 to July 3, 1963, before it was delivered to Bethpage-Peconic on January 24, 1964 (Exhibit A).

*General Description of the A3A.*

The A3A is entered via a chute formed by two hatches—one hinged to the underside of the craft and the other hinged to the flight deck. In fully closed positions these hatches or doors are parallel. The lower hatch fairs with the underside of the fuselage; the upper hatch forms part of the flight deck. In the fully opened positions, both hatches form a contiguous chute, with the lower hatch extending below the underside of the fuselage. For purposes of normal entrance and exit, the lower hatch has three and the upper hatch has two recessed steps for use as hand and foot holds to facilitate climbing into and descending from the plane. For purposes of an emergen-

cy exit, the hatches open in tandem and afford a hasty exit by sliding down the chute.

The bomb bay, which is aft of the flight deck, is accessible from the flight deck by means of the upper hatch. One desiring to move from the flight deck to the bomb bay lowers the upper hatch and also lowers a hinged steel plate (referred to as the companionway safety door) which, when pulled down, lays above the lower hatch and rests against the sides of the companionway. A crewman desiring to enter the bomb bay from the flight deck steps down the lowered upper hatch on to the steel plate and then enters the bomb bay.

Recessed into the left bulkhead of the companionway are various circuit breakers. These are accessible from the flight deck, when the plane is in flight, by lowering the upper hatch under proper procedures.

### Operation and Closing of Hatches.

Each hatch of the A3A is operated by two handles which are connected through a cable and pulley arrangement. To illustrate the operation of these handles, two situations will be described: (1) entrance into the craft from the ground and (2) exit from the craft upon landing.

### Entrance into the craft.

Assuming that the lower hatch is locked, the crewman will unlock and lower it by use of a rotating handle which is recessed into that part of the underside of the fuselage formed by the underside of the lower hatch itself. Once the lower hatch is open, a chute will be formed with the upper door, which is open when the plane is on the ground. The crewman enters the plane by climbing up this chute. The lower door may then be closed in one of three ways:

1) ground personnel may push up that door to its closed position and lock it from the outside by use of the said recessed rotating handle;

2) ground personnel may push up that lower door to a position on its latches (half-latch) and then the crewman inside the plane will lock that door by use of the lower door handle, located on the right side of the companionway;

3) the crewman may raise the lower door once he is inside the plane by use of the companionway D-Ring, a mechanism whose sole function is to raise the lower door to a position where it rests on its latches. Once there, the crewman then locks that door by use of the lower door handle located in the companionway (about four inches below the flight deck), which he moves to the locked position (4529–4536, Ex. 14–B).

Once the lower door is locked, the upper door is locked by use of the handle for the upper door, located in a recessed position in the base of the third crewman's seat which is located on the left side (pilot's side) of the cockpit behind the pilot's seat.

### Exit from the craft.

Once the plane has landed, the upper door is opened by actuation of the upper door handle in the base of the third crewman's seat. Once that door is open, the crewman can reach down and open the lower door by actuation of the lower door handle hereinabove referred to. Then the two doors, so opened, form a chute.

### Emergency exit.

Recessed into the right side of the base of the pilot's seat is an emergency D-Ring (Ex. 49), connected by means of a cable system to both the upper and lower door control systems in such a manner that, when the D-Ring is pulled, the upper and lower door latches are released. In addition, there are two microswitches in the same location which, when actuated, fire cartridges causing the doors to open fully and to drive the lower door down and lock it in the open position. At the same time, an interconnecting cable system locks the upper door in the down position. This system provides a chute extending from the cockpit or flight deck to approximately

two feet below the lowest point of the belly ("lower loft line") of the airplane. The locking down of the latches is designed to shield exiting crewmen from the effects of the slip-stream as they exit the plane in flight (4224–4225). If the D-Ring is pulled only one to one and one-half inches, the latches will become unlatched and the doors will drop down, but the cartridges will not fire so as to lock them down (4226).

The upper door handle, located at the base of the third crewman's seat, is in the 2 o'clock position when the door is locked. To lock that door, the handle is moved upward and clockwise from the 9 o'clock or fully opened position. To unlock the upper door, the handle must be moved counter-clockwise—upward from the 2 o'clock to the 12 o'clock position and then downward from the 12 o'clock to the 9 o'clock position. The lower door handle in the companionway is in the 9 o'clock position when that door is fully closed. To close that door the handle is moved clockwise from the 5 o'clock (open) position down to the 6 o'clock position and then upwards to the 9 o'clock or fully closed position. To open the lower door, the handle is moved downward and counter-clockwise from the 9 o'clock to the 6 o'clock position and then upward to the 5 o'clock position.

The open area of the frame surrounding each hatch is lined with a tubular rubber seal. The function of the upper hatch seal is to prevent the escape of air from the cockpit in order to assure pressurization of the cockpit. When the plane is in flight at high altitudes, only the cockpit area is pressurized. The companionway between the upper and lower closed hatches is not pressurized. These tubular seals are inflated by engine air bleed. They are deflated by the actuation of the upper hatch to the open position. Although these seals are inflated and deflated in tandem, the upper seal can be operative, though the lower seal is not, if the line that connects these seals is capped off. Since the area between the closed upper and the closed lower hatches is not pressurized, the lower hatch seal is not essential to the maintenance of pressurization of the cockpit. Its primary purpose is "to prevent aerodynamic leakage, air change from inside to outside and as an adverse effect on drag. It also serves to prevent water, spray, dust and so forth from entering into the inside of the airplane" (4286). In a system that is properly rigged, the inflated lower seal would tend to restrict bouncing and jiggling, which tends to increase the rate of wear and tear on the latches (4286–4287).

### Pressurization.

The A3A was equipped with a pressurization system for the cockpit only. When an aircraft is flying at high altitude (and jets are designed to so fly), the cockpit must be pressurized and, in addition, the persons aboard must wear oxygen masks. This combination of pressurization and oxygen provides greater crew comfort and mobility at high altitude (796–797). During non-combat flight at high altitude, the cockpit is pressurized to a 3.3 differential, i. e., the difference between the cockpit pressure and the outside air pressure is such that the cockpit pressure is 3.3 pounds per square inch higher than the outside pressure. Thus the high pressure in the cockpit exerts a force of 3.3 pounds per square inch on the entire surface of the cockpit and in the direction of the lower pressure. Since the companionway is not pressurized, that force exerts downward on the closed upper door, the pressure on the upper door of the A3A being equal to 3,326.4 pounds against the entire area of the closed upper door.

If this cockpit pressure is released suddenly at high altitude (by the opening of the upper door while the cockpit is so pressurized), explosive decompression occurs, due to the rush of the high pressure air to the lower pressure air. Such decompression is almost instantaneous and produces in the A3A a tremendous force of approximately one and one-half tons. If the lower door is properly rigged and either in the half-latch or fully locked position, this force can not open the lower

door because the latches (in either the half-latch or fully locked positions) are over center. This means that any force applied to the latches drives them further into the locked position. With the latches in either of these positions, in a properly rigged system, the only circumstance under which the lower door can open is the application of a force of such magnitude as to disintegrate the latch mechanisms. Explosive decompression of a cockpit pressurized to 3.3 is not a force of such magnitude.

If the lower door were not fully locked or not in half-latch position or the latch system were not properly rigged, the lower door will open under the force of the pressure wave of explosive decompression. However, the lower door would remain open for only a very short period of time, because the force of the slip stream tends to push up the open lower door. The force of the slip stream at 300 knots is so great that a crewman could stand on the lower door, pull the lower door handle to the open position and not fall out of the plane (4305).

### *The claimed negligent design and construction.*

The plaintiff sought to establish through its expert witness, Frank Jagger, a Grumman employee, the following alleged design defects:

1. lack of ejection seats as a means of emergency escape;

2. the upper door should have opened up and into the cockpit, instead of down into the companionway;

3. there were no "placards, decals, lights or warning system of any kind relating to the operation of the handles and the hatch-door positions in the aircraft";

4. "there was no safety lock system on the handles to prevent inadvertent movement thereof and inadvertent opening of the hatches";

5. no instruments (including circuit breakers) should have been located in the bulkheads of the companionway, since it was contemplated that crewmen would have to use them while the craft was pressurized and in flight;

6. the lower door handle moved downward to open the hatch—it should not have moved in the same direction as an exiting crewman.

The plaintiff's witnesses, who gave opinion evidence as to the design and construction of the A3A, were not aircraft designers. Jagger had been an engineering student at the University of Michigan for only two and one-half years. He left during his third year (2998–2999) and became a draftsman in the employ of Grumman (3005). His employment from 1940 on was broken by a 5 or 6 year tour of duty in the Navy, where he became a fighter pilot in 1942 and an aviation safety officer in 1944. In 1946, he returned to Grumman where he worked as a "layout design engineer," designing flight control systems, until February 1953 when he was recalled to duty by the Navy and served until August 1955 (2996–3030). While serving this second tour of duty, he was an aviation safety officer in a naval air basic training command. He returned to Grumman in August 1955. For one year he worked as a safety specialist in the engineering department. Thereafter, he served in the flight operations department, with no title, as liaison between that department and Grumman's engineering department (3030–3037). He had very little to do with the actual investigation of aircraft accidents at Grumman. He took no part in the investigation of the instant accident, other than providing photographers to Navy personnel, and, in fact, knew nothing about the A3A at that time. During the investigation of the instant accident, he went into the A3A out of "curiosity" since the A3A was new to him (3080–3086). It was apparent to the court that Jagger was unfamiliar with the technical aspects of the design and construction of the A3A. The record is replete with instances of his total unfamiliarity with the A3A and its systems, upon which he presumed to express "expert" opinions. In fact, on innumerable occasions, the court urged

plaintiff's counsel to obtain a more qualified expert, all to no avail. Plaintiff did, however, at the last minute offer as an expert one Herbert Aronson, an associate professor of mechanical engineering at the New York Institute of Technology, who was even less familiar than Jagger with aircraft in general and, specifically, the A3A. Both of these witnesses ignored the basic principle of the design and construction of military aircraft—that, of necessity, it is a compromise of many considerations in order that the plane may be capable of performing its desired mission and that, toward this end, some degree of safety must be compromised. .

The defendant's expert witnesses, on the other hand, were indeed experts in the field of aircraft design. Charles Harris (Harris), in the employ of Douglas since 1952, holds a degree in electrical engineering; is a registered mechanical engineer in the State of California; designed various systems of the F–5–B, the A–4, A–3–D, the A–3–A, the DC–10. He was associated with Douglas when the A3A made its maiden flight and had been connected with the A3A and its modifications continuously from 1952 to the date of the trial, with the exception of one year during which he worked on the design of the DC–10 (4186–4192).

Leo Devlin (Devlin), assistant to the Vice-President of the Military Systems Division of Douglas and in his 37th year with Douglas at the time of the trial, had occupied the following positions:

design engineer,
project engineer,
chief designer, 1943–1951,
assistant chief engineer,
chief engineer,
vice-president of engineering.
(4578–4582)

During these 37 years, he had participated in the design of 30 aircraft, including the A3A and was Douglas' Chief Designer during the planning, designing and construction of the A3A.

*Ejection seats.*

Reference has already been made to the testimony of Douglas' Chief Designer as to why the A3A was not equipped with ejection seats. Considering the mission of the A3A as a carrier-based craft and the state of the art when the A3A was designed and produced, the court finds that neither Douglas nor the Government was negligent in the design and construction of the A3A without ejection seats.

*The upper hatch.*

Jagger expressed the opinion that the upper hatch should have been designed so as to open upward into the cockpit, instead of downward into the companionway, so that the pressure on that hatch (while the cockpit is pressurized and the upper hatch is closed) would tend to keep the door closed (3247) and, if that hatch were inadvertently actuated, the door would not open in the same direction as the force of the pressure wave (3248). The court inspected this very A3A at Floyd Bennett Field during the trial; entered the craft and observed the companionway, the cockpit area and opening and closing of both hatches. One did not have to be an engineer or an aircraft designer to appreciate the testimony of Harris as to this opinion of Jagger. It was his opinion that an inward opening upper hatch would create considerable problems in crew movement, particularly in a situation requiring emergency escape, in that it would constitute an obstacle to such a speedy exit (4299). Furthermore, such a door, against which the pressure would measure approximately one and one-half tons, would require mechanical power in order to be opened and would present an additional safety hazard (4299). The court has already adverted to the fact that, in an over-center locking device (such as was designed and built into the latches of the two hatches of this A3A), the downward force of the pressure, far from tending to open the upper hatch, tends to lock it more securely.

Although the claimed negligence in designing the upper hatch to open downward was the subject of considerable testimony at trial, plaintiff appears to have abandoned this claim in its proposed findings and conclusions. In any event, the court finds that the plaintiff has failed to establish negligence in the design and construction of the A3A which had a downward-opening upper hatch.

*Warning system re-eopening upper hatch.*

Jagger testified that a red warning light or a decal warning of some kind should have been placed in the vicinity of the upper hatch handle. As to a warning light, Harris countered with the observation that such a light might malfunction, thus creating a hazard to any crewman relying on the absence of such a light as an indication that the cockpit was not pressurized (4296–4298). In the instant case, Kropp knew that the cockpit was pressurized. Thus the absence of such a light or of any other warning device could not have been a competent procuring cause of the accident. Furthermore, the upper hatch handle was painted yellow, which is known (in military aircraft) to be a warning device. In fact, it is plaintiff's contention that Kropp opened the upper hatch inadvertently (plaintiff's proposed finding of fact No. 60).

### Safety lock.

Plaintiff claims that there should have been a safety-lock mechanism or detent of some kind to prevent the inadvertent opening of the upper hatch. As Harris pointed out, any device added to an emergency escape chute system "degrades the reliability of the system because any device has a possibility of malfunction. If you added a positive lock [detent], which I believe he [Jagger] was suggesting, then you have to add a means to release the positive lock. So now, in addition to the functions that the D-Ring has to pull in an emergency you have to add the function of releasing the lock or detent if it is incorporated on the handle * * * you want to keep it as simple and straightforward as possible, with a minimum of things that could go wrong" (4307–4308).

Here too, the absence of any such device could not, on the facts of this case, be a competent procuring cause of the accident, since Kropp knew that the cabin was pressurized and disobeyed Runyon's command not to depressurize. Having disobeyed that command, it is not unlikely that he would have unlocked any detent had it been present.

### Circuit breakers in companionway.

At the trial, Jagger testified that there should not have been any circuit breakers in the companionway (3261–62). Plaintiff appears to have abandoned this claim, since it requests no such finding. And for good reason. Devlin's testimony made it clear that crew movement through the companionway to the bomb bay was necessary, in flight, in order to set the A-bomb to be released and dropped (hopefully) on the intended target. Since such crew movement was contemplated in order that the A3A could fulfill its primary mission, it follows that the placing of circuit breakers in the companionway was not negligent design or construction.

It should be noted, as will be developed more fully *infra*, that Kropp was not approved by the Government to make any in-flight mechanical corrections and, therefore, should not have moved from the cabin to the companionway for that purpose. It was this fact, rather than the location of the circuit breakers, which set in motion the chain of events that culminated in his untimely death.

### The lower door handle.

Jagger opined that there was negligence in the design and construction of the lower hatch handle because its initial opening movement was downward and in the same direction as an exiting crewman; that this negligence was a proximate cause of Kropp's death. He relates this negligence to Kropp's death by his theory that, as Kropp's body proceeded

into the companionway, it struck the lower door handle and thus the lower hatch opened; that, had that handle been designed to move upward in order to open that hatch, the lower hatch would not have opened and Kropp could not have exited the craft (3271).

Douglas' experts adverted to a general principle as to the movement of controls in aircraft; that the controls should move in the same direction as the desired performance of the craft or its component parts. For example, the control mechanism which lowers and raises the landing gear moves in the desired direction of the landing gear, i. e., downward to lower and upward to raise that gear. The mechanism which controls the altitude of an airplane moves in the same desired direction, i. e., downward to lower and upward to raise the nose of the plane. This general principle is premised upon the natural instinct or proclivity of man when operating controls. It is understandable that, when one desires to effect a downward movement, he thinks in terms of that objective when he handles the control mechanism. From the standpoint of standardizing procedures, in order to facilitate crew transition from one type of aircraft to another, the application of this general principle is highly desirable. Harris summarized this general principle as follows: " * * * forward or clockwise to go, aft or counter-clockwise to slow * * * [c]lockwise, forward and up, to increase the performance; counter-clockwise, aft and down to decrease the performance" (4310). Closing a door of an aircraft is considered as increasing performance; opening it is deemed to be decreasing performance (4311). Thus it can be seen that the lower door handle (which moved clockwise to close and counter-clockwise to open) was designed in accordance with this generally accepted principle of control movement design.

 It is to be noted that these control handles were recessed, in order to prevent their inadvertent actuation by the body of a passing crewman. When the cause of this accident is discussed it will become apparent that it was not caused by Kropp's body hitting and actuating the lower hatch handle and, therefore, that the design of the movement of that handle was not a proximate cause of Kropp's death.

As to all of plaintiff's claims of negligence in design and construction, the court finds that the plaintiff has failed to sustain its burden of proof.

In light of the court's findings in this regard, it is unnecessary to reach the contentions of the Government and Douglas that (1) the Government is immune from suit based upon negligence in design and construction and (2) that Douglas is a beneficiary of that immunity. The cases construing 28 U.S.C. § 2680(a) (see footnote 1) indicate that, when an act is performed in behalf of the Government at a "planning," rather than an "operational" level, the Government is not subject to liability under the Federal Tort Claims Act. Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). Design of an aircraft or any part thereof has been held to be at the "planning" level, Moyer v. United States, 302 F.Supp. 1235 (S.D. Fla.1969); Swanson v. United States 229 F.Supp. 217 (N.D.Cal.1964); see Jayson, infra, ch. 12, § 249.06[1], pp. 12–53–63. The court does not reach the novel beneficiary claim of Douglas, as to which its research has revealed no authority.

*Other claims.*

In addition to the claims of negligence in design and construction against both defendants, plaintiff claims against both defendants "a breach of implied warranty" and, as to the Government, charges it with failure "to effectively supervise and control the equipping, operation, maintenance and inspection of subject aircraft" and failure "to effectively supervise the training, qualification, including the decedent, and the manning of said aircraft, which duties

were not delegable"; "failed to provide a safe place for Kropp to work, which duty was not delegable." Plaintiff attributes Kropp's death "to the acts and omissions of the defendants."

### Breach of Warranty.

The amended complaint alleges as a "Third Cause of Action as to Defendant Douglas Only" that Douglas impliedly warranted to the Government and its employees "and to all persons who rode the aforesaid Douglas jet aircraft, including the plaintiff's decedent" that the A3A "and all of the component parts, equipment and accessories thereof were free from any and all defects and dangers and were of merchantable quality and fit for the purposes for which they were designed, manufactured, modified, sold and intended" and that Kropp died as a result of Douglas' breach of that implied warranty.

▮ There are three essential elements which must be established by a preponderance of the credible evidence in order to sustain against a manufacturer a claim of breach of implied warranty: (1) that the product was defectively designed or manufactured; (2) that the defect existed when the manufacturer delivered it to the purchaser or user; (3) that the defect is a proximate cause of the accident. Nicklaus v. Hughes Tool Company, 417 F.2d 983 (8th Cir. 1969); Swain v. Boeing Airplane Co., 337 F.2d 940 (2d Cir. 1964), cert. denied, 380 U.S. 951, 85 S. Ct. 1083, 13 L.Ed.2d 969 (1965); Restatement (2d) Torts § 402A.

The court has already found that there was no negligence in the design and construction of the A3A. The record is barren as to the condition of the A3A when it was delivered by Douglas to the Navy on August 30, 1955. There is general evidence in the record that the Navy makes an acceptance inspection of all new aircraft before it accepts delivery from the manufacturer. There is no evidence that the A3A was not accepted by the Navy and, therefore, it is reasonable to infer that the plane was in good working order and free of any defects when it was delivered by Douglas and accepted by the Navy.

Plaintiff's overall claims relate to the absence of the lower door seal and to alleged handle creep, defects which it claims to be proximate causes of the accident. The record does not support the claim that either of these conditions existed on August 30, 1955, the date of delivery of the A3A by Douglas.

▮ The court refuses to find Douglas liable on the Third Cause of Action, cf. Krause, supra. Having found no negligence in design and construction, the court directs that judgment be entered in favor of Douglas and against the plaintiff.

▮ In his proposed Conclusions of Law, plaintiff's counsel requests the court to conclude that the Government is similarly liable for breach of warranty. Although no such claim is alleged in the pleadings, it appears from the proposed Conclusions of Law and the plaintiff's post-trial memorandum that plaintiff bases this claim on the alleged control of the A3A exercised by the Navy over the design as well as the operation of the A3A while it was at Bethpage-Peconic. The court has already found that there was no negligence in the design of the A3A. As to the control of the A3A while at Bethpage-Peconic, the court finds, for the reasons stated infra, that the Navy was not in such control of the A3A as to render it liable on plaintiff's theory of breach of implied warranty. Krause, supra.

### Kropp's Training and Lack of Navy Approval.

One of the key issues at the trial was Kropp's training. The plaintiff contends that Kropp was not properly trained and that the Government is ultimately liable therefor; that whatever Kropp did aboard the plane that may have caused or contributed to the accident is not to be attributed to any negli-

gence on his part but, rather, to the failure of the Government to "effectively supervise the training, qualification, including the decedent, and the manning of said aircraft, which duties were not delegable." (Plaintiff's proposed Conclusion of Law, 10.)

Grumman assigned Kropp to the A3A as a plane captain trainee in October 1964, approximately three to four months before the accident. A plane captain is a mechanic assigned to a particular aircraft. It is his responsibility to see that all maintenance and repair on that plane is done properly. To this end, he may request other mechanics to assist him. A flying plane captain is a plane captain who has been approved for either flight personnel or flight crew duties. *See infra.*

Before being so assigned as a plane captain trainee, Kropp had been a plane captain assigned to the F–11 (a single seat Navy fighter aircraft, pressurized at high altitudes), and the A6A (a two seat attack aircraft, similarly pressurized) (1972–1975). He had been in the employ of Grumman continuously since August 1952, except during his period of military service from 1956 to 1958 (Ex. 66).

Young, a Grumman employee, was assigned, by Grumman, to train Kropp as a flying plane captain aboard the A3A. There was no written Grumman curriculum for the training of such plane captains (1824). Young "was to teach him [Kropp] what I [Young] knew about it [the A3A]." As of the date of the accident, Young had been a Grumman employee for approximately ten years as an airplane mechanic, originally as an assistant plane captain. In early 1959 he was assigned to the A3A and sent to Mobile Training, Sanford, Florida, a Navy school, for a plane captain indoctrination course. Upon his return from Sanford, he was sent to Mitchell Air Force Base to go "through the altitude chamber course"; then he went "into the flight program of the A3A, which included safety and air-sea rescue lectures

that Grumman maintains." Young was the plane captain of the A3A in question from the time when it arrived at Peconic to and including the date of the accident. As such, he "looked after the airplane. I was cognizant of everything and anything that went on with that airplane, as far as maintenance was concerned" (558).

Although Young was the person charged with training Kropp and was called as a witness for the plaintiff, no material questions were asked of him on direct as to Kropp's training. This omission was pointed out to counsel by the court during Young's cross-examination (1830), when testimony on this score was then elicited. Over the few months preceding the accident, Young went over the A3A with Kropp, discussed with him "the various parts, various components, the way systems operated, we referred to the HMI [Handbook of Maintenance Instructions]. We had some service information summaries * * * I had school notes that we referred to, possibly, at times, I had some notes from my day and a half down there at Mitchell Air Force Base when I went through the altitude chamber" (1824–1825). Both Young (as plane captain) and Kropp (as a mechanic and plane captain trainee) were on full-time A3A duty (1825). Kropp had received altitude indoctrination at the Naval Air Station, Quonset Point, Rhode Island (Ex. LL).

Young recalled two flights aboard the A3A prior to the fatal flight during which Kropp accompanied him. On the second such flight Young wanted to familiarize Kropp with the procedure for opening the upper door and proceeding through the companionway into the bomb bay while the A3A was at high altitude and the cockpit was pressurized. When the plane was at an altitude of approximately 13,000 feet, the pilot (Runyon) depressurized the cockpit at Young's request. "We waited for the pilot to clear it and tell us it was okay to open the airhatch [sic] and I opened

the inner** hatch and we went through the companionway and opened the tunnel door and went back into the bomb bay area. We turned back and came back into the cockpit and I closed the door again" (1831–1832).

The plaintiff's expert, Jagger, testified that, in his opinion, Kropp was properly trained for duty as a flying plane captain, although his training had not been fully documented and formally recorded (3775–3776).

Little's accident report was received in evidence (Ex. 15) as being admissible, Pekelis v. Transcontinental & Western Air, Inc., 187 F.2d 122 (2d Cir. 1951), leaving open until the conclusion of the trial the consideration as to what weight should be accorded to it. That report is more fully discussed *infra*. As to Kropp's training, Little made a conclusion which appears to be the only evidence in the record in support of plaintiff's claim that Kropp was improperly trained. Little concluded that "the mere fact that Kropp himself actuated the upper hatch release handle seems to be incontrovertible evidence of lack of proper training. Such an action is completely incompatible with foreknowledge of the effects of explosive decompression" (Ex. 15, p. 4). The mere fact that an accident occurs does not, ipso facto, establish inadequate training.

Jagger testified that, during 1944 and 1945, he was a safety officer at an Advanced Training Command for fighter pilots at Jacksonville, Florida; that the pilots being trained there were not mere novices—had had considerable training before their assignment to that Command; that there were daily accidents of a minor nature and serious accidents weekly; that 60% of all accidents were due to crew error (3366–3370). Runyon gave as an example of mental lapses by experienced pilots the pilot who forgets to lower his landing gear. The assumption in the accident report that the mere fact of the instant accident was attributable to inadequate training is not supported by logic or the credible evidence. Young's testimony establishes that he familiarized Kropp with the parts of the plane which must have included the hatches and their proper operation. The very fact that Kropp told Runyon, immediately prior to the explosive decompression, that he was going to depressurize the cockpit before entering the companionway supports this finding.

On the basis of the credible evidence (including the testimony of Runyon, Young and Jagger), the court cannot find that Kropp was not properly trained and not knowledgeable as to the principles and dangers of pressurization in general or with reference to the A3A and the proper procedure for opening and closing the hatch doors, the accident report to the contrary notwithstanding.

### Lack of Navy approval of Kropp as crew member.

Captain Vita (Vita), as BUWEPS Representative at Bethpage, had as his primary overall function the duty of seeing to it that Grumman performed its obligations under its several contracts with the Government, including the instant bailment contract. Under such bailment contracts, Grumman was required to and did prepare and submit to Vita or his designated representative, for approval, two manuals. One related to "Maintenance of Bailed/Loaned Aircraft" (Ex. EE). The other was a flight procedures (operations) manual, no copy of which was available during the trial. Despite that missing manual, a document entitled "REQUIREMENTS FOR CONTRACTOR OPERATING PROCEDURES AND FLIGHT CREWS," was received in evidence (Ex. 8). This exhibit and Vita's testimony give the substance of the missing manual as to the procedures to be followed by Grumman to obtain Government approval of its

** The upper hatch is also called the "inner hatch"; the lower hatch is also called the "outer hatch".

employees to fly aboard a Navy owned bailed aircraft.

It was Vita's responsibility to approve contractor personnel who were to participate in air crew (flight crew) duties for the contractor (4915). Grumman was required to submit to Vita's office for review the qualifications of those whose approval was so requested. Before such approval was sought, Grumman was required to submit a Letter of Intent, indicating that Grumman intended to qualify its particular employee for air-crew duty aboard a specific craft (4915, Ex. 8, section 5c, d). For example, Grumman submitted to Vita's office a letter to the effect that it intended to give Runyon qualification training to pilot the A3A and other designated craft (Ex. 10). Thereafter, Grumman requested and the Government approved Runyon as a pilot "in the Test Flight category" (Ex. 11).

It is undisputed that this procedure was not followed by Grumman with reference to approval of Kropp and that the Navy never approved him as a flight crew member. Exhibit LL, dated January 20, 1964 and attached to the accident report, is a Grumman request for approval of Kropp as a contractor's non-crew member (flight personnel) which was not received by Vita's office prior to the accident and, a fortiori, was not granted (4918, 4922–4924, Ex. 15, p. 5). Through a Grumman administrative error, this request sought his approval as a non-crew member (flight personnel), when in fact it intended to seek his approval as a crew member (Ex. SS, Ex. 15, p. 5). Qualifying Kropp as flight personnel would not have authorized him to accompany the instant flight as a crew member "as he was doing on the day of the accident" (Jagger's testimony on cross-examination at p. 3999). One page of the missing Grumman Flight Operations Manual, Exhibit 19, provided that the A3D (A3A) "requires a flight crew member, in addition to the pilot. * * * *"

■ The court finds that Grumman was training Kropp to become a flight-crew member, not as flight personnel; that it submitted the wrong request to BUWEPS REP which did not include sufficient documentation as to Kropp's training for approval as a flight-crew member; that in any event, this erroneous request was not acted upon; that the Navy had no knowledge that Kropp was aboard the A3A in a flight-crew capacity; that the Navy had not waived the required approval; that Kropp's presence aboard the A3A on January 27, 1965 was unauthorized and due solely to Grumman's failure to comply with its own Manual (approved by the Navy); that the Navy was not responsible for Kropp's presence aboard the A3A during the fatal flight; that the Navy had no direct responsibility to train Kropp or supervise his training by Grumman.

*Vicarious Liability of the United States.*

■ The plaintiff claims that, regardless of whether the accident was due to the negligence of Grumman in the training of Kropp or the maintenance of the A3A while it was at Peconic, the Navy is ultimately liable (on the theory of vicarious liability) for any such negligence on the part of Grumman.[2]

■ The Federal Tort Claims Act, 28 U.S.C. § 1346(b) provides that the district courts shall have exclusive jurisdiction of civil actions against the United States for money damages for "personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, *if a private person,* would be liable to the claimant in accordance with the law of the place where the act or omission occurred." [emphasis added] Since the Government is

2. * * * * * *
It is to be noted that, having recovered Workmen's Compensation from Grum-man, the plaintiff has no further remedy against her deceased husband's employer.

to be treated as a private person, the liability of the United States, if any, for injury or death to an employee of a government contractor will depend upon whether, under the law of the situs of the tort, the relationship of the *contractor* to the Government is that of "employee" or "independent contractor." Although the Government is clearly liable for its own negligence, it is well-settled that no liability attaches to the Government *vicariously* for the negligence of its contractor, provided the latter is deemed an independent contractor and not an employee. *See* Jayson, Handling Federal Tort Claims, § 162, pp. 5–105 et seq. Title 28 U.S.C. § 2671 provides that a "contractor with the United States" does not fall within the definition of "federal agency," but this does not mean that a contractor may not be a federal "employee." If the contractor is deemed an agent or employee of the Government, then the United States may be liable for the negligence of the contractor under the doctrine respondeat superior. Ira S. Bushey & Sons, Inc. v. United States, 276 F.Supp. 518 (E.D. N.Y.1967), aff'd, 398 F.2d 167 (2d Cir. 1968).

There appear to be no fixed guidelines by which to determine whether one who acts for another is a servant or an independent contractor. Generally, that determination depends upon the facts and circumstances of the given case. Buchanan v. United States, 305 F.2d 738 (8th Cir. 1962); Strangi v. United States, 211 F.2d 305 (5th Cir. 1954). Several factors (frequently considered in making this determination) include:

(a) the extent of control exercised by the hirer [the Government] over the details of the work;

(b) whether the contractor is engaged in a distinct occupation or business;

(c) the skills required for the job;

(d) who supplies the place of work and equipment;

(e) the understanding of the parties. Restatement (2d) of Agency § 220 (1957).

The degree of control exercised by the employer over the actual operations of the contractor's work has emerged as the primary consideration in determining the character of the relationship between employer and contractor. Naturally, in most situations where the United States awards a contract to a private concern, the United States will reserve the right of general supervision, in order to assure that the contractor is meeting its obligations. Such general supervisory power, without more, is the hallmark of the independent contractor relationship. The line (albeit vague) is crossed when the employer, i. e., the Government, takes over the contract obligations or actually directs the performance of the contract by the contractor and its employees. *Buchanan, supra,* 305 F.2d at 744; United States v. Page, 350 F.2d 28 (10th Cir. 1965); Mahoney v. United States, 216 F.Supp. 523 (E.D.Tenn.1962). In this regard, the court in *Page, supra,* stated:

> "The fact that the work and duties of the independent contractor and of his employees originate in a contract, in plans, or in regulations, issued by the Government, does not create a duty by it to the employees where there was not such an affirmative control and direction by Government officials over the employees or interference in the work of the contractor as to create conditions where there was in fact no independent contractor." 350 F.2d at 31.

Stated succinctly, and perhaps at the risk of oversimplification, an independent contractor relationship will most likely exist where the Government's primary concern is in a finished product, but the master-servant relationship will exist where the Government's concern is *also* with the *method* and *means* by which the finished product is developed. A master-servant relationship is not cre-

ated merely because the work being done is subject to the direction, inspection and acceptance of a Government-appointed officer. "The reservation of the right to prescribe what shall be done, but not how it shall be done does not divest the employee of the character of a contractor." *Mahoney, supra,* 216 F. Supp. at 528.

The courts have looked consistently to the contract between the Government and the contractor as a point of departure for determining the degree of control exercised by the Government. Although the contract is not determinative, most, if not all, of the cases dealing with the question of control, have held the United States free of liability despite the existence of the following types of contract provisions and reservations: (1) a general right of supervision and control over work, Wright v. United States, 404 F.2d 244 (7th Cir. 1968); Yates v. United States, 365 F.2d 663 (4th Cir. 1966); Grogan v. United States, 341 F.2d 39 (6th Cir. 1965); Strangi v. United States, 211 F.2d 305 (5th Cir. 1954); (2) the obligation of the contractor to comply with federally-established safety standards, e. g., those appearing in Air Force technical orders or those prescribed by a United States Contracting Officer, Craghead v. United States, 423 F.2d 664 (10th Cir. 1970); United States v. Page, 350 F.2d 28 (10th Cir. 1965), cert. denied, 382 U. S. 979, 86 S.Ct. 552, 15 L.Ed.2d 470 (1966); Roberson v. United States, 382 F.2d 714 (9th Cir. 1962); Bailey v. United States, 291 F.Supp. 800 (W.D. Okl.1968); (3) material and workmanship subject to Government approval, Strangi v. United States, *supra;* Hamman v. United States, 267 F.Supp. 411 (D.Mont.1967); (4) observance of federal fair labor standards, Strangi v. United States, *supra;* (5) periodic government inspections, Beason v. United States, 396 F.2d 2 (5th Cir. 1968); Yates v. United States, *supra;* Blaber v. United States, 332 F.2d 629 (2d Cir. 1964); Galbraith v. United States, 296 F.2d 631 (2d Cir. 1961); (6) periodic reports of lost-time accident to be filed with the Government, Roberson v. United States, *supra;* (7) the right of the Government to stop work when thought to be in the public interest, or when safety measures are not being observed, Lipka v. United States, 369 F.2d 288 (2d Cir. 1966), cert. denied, 387 U.S. 935, 87 S.Ct. 2061, 18 L.Ed.2d 997, reh. denied, 388 U.S. 925, 87 S.Ct. 2129, 18 L.Ed. 2d 1381 (1967); Strangi v. United States, *supra;* (8) massive Government safety programs with special training for the contractor's employees, Mahoney v. United States, 216 F.Supp. 523 (E.D. Tenn.1962); Buchanan v. United States, 190 F.Supp. 523 (D.Minn.1961), aff'd, 305 F.2d 738 (8th Cir. 1962).

This list, while not exhaustive, reflects the widely-held view that, although the Government may establish safety standards or reserve the right to inspect and approve, the negligent exercise of such Government functions may still not suffice to attach liability to the United States:

"If the government representatives on the job are negligent in their inspection duties, or fail to require or enforce proper safety measures, or if they are negligent in supervision, it does not necessarily follow that a contractor's employee, injured thereby may obtain recovery against the United States; for the question then arises whether their inspection and other duties were intended to be solely for the benefit of the Government in securing appropriate performance of the work contracted for, or also were intended to be for the benefit of the contractor's employees." Jayson, Handling Federal Tort Claims, § 162, p. 5–106.

On the other hand, where the Government actively participates in the operation of the project—managing details of the work and supervising employees directly—this greater degree of control may impose a duty of care not imposed when the Government's only role is that of an overseer.

The mere fact that the Government owns the property being worked on by the contractor is also insufficient control to attach liability to the United States for *negligence* of the contractor. The FTCA contemplates claims based only on the *negligence* of employees or agents of the Government. Claims not specifically grounded in negligence, such as those based on warranty, product liability or absolute liability, are not within the purview of the Act. United States v. Page, *supra*, 350 F.2d at 33. On the other hand, there is some authority for the proposition that one who hires a contractor may be liable to employees of the contractor for the latter's negligence (even though the contractor is deemed an independent contractor) if the work being done is "inherently dangerous." For example, in *Mahoney, supra,* a motion for summary judgment by the Government was denied in a suit by a contractor's employee under the FTCA on the premise that the operation of an atomic energy plant falls within the dangerous instrumentality exception to the independent contractor rule. 216 F. Supp. at 535–536. *See also* Kuhne v. United States, 267 F.Supp. 649 (E.D. Tenn.1967), a similar case arising out of the same set of circumstances as in *Mahoney.* The better and more widely-accepted rule appears to be that the "dangerous instrumentality" principle has no place in actions brought under the FTCA by employees of government contractors. Certainly, this would be consistent with the language of the Act, which requires that the negligence or wrongful act or omission be committed by a government agent or employee. *See* Gowdy v. United States, 412 F.2d 525 (6th Cir. 1969); Wright v. United States, 404 F.2d 244 (7th Cir. 1968); *cf.* Jayson, Handling Federal Tort Claims, Sec. 162, p. 5–106. In other words, the Government is not liable under the FTCA merely by virtue of its ownership of dangerous property, since such liability would be tantamount to imposition of absolute liability without regard to negligence.

### *Is the Government vicariously liable?*

It is plaintiff's claim that the Navy manifested such control over the performance by Grumman of its contract with the Navy that it should be held liable for any negligence on the part of Grumman. The claimed acts of negligence of Grumman, for which the plaintiff seeks recovery against the Government are: (1) its training and selection of persons to fly aboard the A3A and (2) its maintenance of the A3A. The plaintiff claims that the Government is liable for its failure to effectively supervise and control Grumman's training and flight crew selection; its failure to effectively supervise the maintenance and inspection of the A3A while bailed to Grumman pursuant to the contract hereinabove referred to; its failure to provide Kropp with a safe place to work.

It is the plaintiff's contention that the duties and functions of the Government and Grumman were so inextricably intertwined as to constitute the Government and Grumman a cog in the gear mechanism of the "military-industrial complex"—a term attributed to our late President Eisenhower. A cogent analysis of the facts adduced at trial, and hereinafter summarized, reveals no such inseparable duties and functions and no such "military-industrial complex," in the sense in which plaintiff uses that term.

Grumman maintained two plants—its main plant at Bethpage, at which it employed approximately 30,000 persons, and its facility at Peconic which it occupied under lease from the Navy. There, Grumman had approximately 1800 to 2000 employees (4782). Among other Grumman activities at Peconic, it housed, maintained, inspected and used, during 1964–1965, 14 aircraft bailed to it by the Government, one of which was the A3A here in question.

It is a matter of common knowledge (and was so testified to during the trial) that much of Grumman's business was and is of a military nature—be it the production of military equipment or, as in the instant case, the testing of equipment installed by Grumman in the E2A, an aircraft built for the Navy by Grumman. Obviously, the Navy had a considerable interest in the performance by Grumman of its contractual obligations with reference to Navy aircraft bailed to Grumman, representing a Government investment of millions of dollars. In order to preserve and protect all of its interests it maintained Navy personnel at Bethpage and Peconic and prescribed and approved procedures for the selection and approval of flight crews and the maintenance of its bailed aircraft by Grumman.

The Grumman personnel and the Navy personnel each performed separate and distinct functions. The former performed the obligations of Grumman under its contract with the Navy. The Navy personnel were stationed at these two Grumman facilities to ensure proper performance by Grumman. It was the contractual obligation of Grumman to maintain, repair and inspect the bailed aircraft; to train and assign crew members; to decide when bailed aircraft were to be flown, what Grumman personnel would constitute those to accompany each flight; to select, train and assign ground personnel (including plane captains) to the several bailed aircraft.

The functions of the Navy personnel, as testified to by Captain Vita and Aloysius Kasten, the Navy Quality Control Supervisor at Peconic, were primarily to review Grumman's performance of its duties under all contracts with the several branches of the Armed Forces, including the bailment contract in question. The Navy did not select any ground or flight personnel. It only reserved the right to *approve* proposed flight personnel. Once flight personnel were approved by Vita's office, the Navy took no part in their assignment by

Grumman to any particular flight, nor did it schedule flights of bailed aircraft or fly any such aircraft. Nor did it perform the physical maintenance of any such craft or the primary inspections thereof. As to maintenance, repair and inspection, the Navy merely spot reviewed the work of Grumman personnel after it had been certified by Grumman inspectors. In many instances, because of the small ratio (1 to 10) of Navy to Grumman inspectors of bailed aircraft (4770), Navy inspectors accepted the certification of Grumman's inspectors without physically checking the work of Grumman's maintenance personnel. The duties and functions of the Navy personnel were performed solely for the benefit of the Government in securing appropriate performance of the work contracted for and protection of the Navy-owned bailed aircraft.

For each bailed aircraft, a Grumman employee was selected and assigned by Grumman to serve as a plane captain, charged with the responsibility for the physical maintenance of the plane. No Navy approval of such selection and assignment was required, save in the limited situation when Grumman desired a plane captain to serve as flight personnel or flight crew.

 The court finds that the Government did not assume a degree of control over the performance by Grumman of the bailment contract sufficient to render it vicariously liable for the claimed negligence of Grumman in the maintenance of the A3A and the training and selection of Kropp to fly aboard the A3A in any capacity. The court finds, further, that it was not the duty of the Navy to maintain the bailed aircraft or to train and assign any personnel (ground or flight) to any of its bailed aircraft.

In light of the case law on this subject, *supra,* the court concludes that the Government is not vicariously liable for any of Grumman's negligence in its maintenance and operation of the A3A and in its training of Kropp.

*Post accident events.*

A short time after the A3A returned to Peconic, Captain Vita orally directed Commander Little (Little), the resident naval officer in charge of the Navy facility at Peconic, to conduct a one man incident investigation and report his findings.

The Code of Federal Regulations provides for three types of administrative fact-finding bodies, including a one-of-ficer investigation convened by oral order. Such an investigation may be formal or informal. If informal, it employs, for the most part, "the preliminary inquiry method using correspondence, telephone inquiries and informal interviews to gather the required information conveniently and expeditiously" and is designed "to meet necessary investigative requirements with a minimum commitment of officers." An informal fact-finding body does not take testimony under oath, nor are its proceedings recorded. 32 C.F.R. §§ 719.151(a), 719.-254, 719.150(c), 719.251(c), 719.254(a), (c). Vita, as the officer in command, and the "cognizant reporting custodian" was authorized to order such a one-officer investigation, 32 C.F.R. § 719.-152(b), regardless of the fact that the A3A was in the physical possession of Grumman pursuant to the contract between it and the Navy (4905–4908, Ex. 57). The reports of all three types of fact-finding bodies are purely advisory; their opinions do not constitute final determinations or legal judgments and their recommendations are not binding on the convening or reviewing authorities. 32 C.F.R. §§ 719.150(c), 719.-251(c).

Little, who conducted this informal investigation, died prior to the trial. Had he been alive and available as a witness, the court would have been able to learn of the details of the investigation, i. e., what persons he interviewed, their qualifications, what documents and telephonic inquiries he relied upon, his own qualifications (there is no evidence in the record as to whether he was current on the A3A) and generally the basis of his opinions and recommendations which appear in his report (Ex. 15), which will be considered, *infra.*

Fortunately, Young was on the flight line when the A3A landed at approximately 11 A.M. He opened the lower hatch, entered the plane and discovered that Kropp was missing. (The pilot did not know, until this time, whether Kropp had exited the craft or was still aboard in the companionway.) At noon, the plane was towed to a Grumman hangar where William Schick, Young's supervisor, ordered Young to begin a daily inspection in preparation for a flight the next day. He countermanded this order shortly thereafter, presumably because Little desired certain tests to be performed the following day (1338–1348).

On January 28th, Little's investigation commenced. Photographs of the hatches and their handles were taken by a Grumman-supplied photographer. Various tests were performed by Grumman employees, including a cabin pressurization check and tests with a dummy under pressurization. Young performed an air-frame inspection which revealed several discrepancies (Ex. 27). After considering all the evidence, the court does not deem these discrepancies relevant to the plaintiff's claims. On February 1st, Young inspected the craft, with special attention to the rigging of the lower hatch. This inspection included a thorough check of the latches. The results of Young's "Special Check" (Ex. I) revealed that the lower hatch system was in good working order (as specified in the HMI, Ex. K) with the exception that one set screw had to be adjusted to the tolerances prescribed in the HMI. This adjustment will be discussed more fully *infra.*

Shortly after the relevant tests had been conducted, Samuel Day, a field service representative of Douglas, arrived at Peconic. It is apparent from his report, dated June 23, 1967 (Ex. 33) that the information contained therein was hearsay. Over the strenuous objection of both defendants, this report was

received in evidence only as against Douglas. Day did not testify at the trial. His deposition, taken January 17, 1969, was read into the record (2144–2460, including innumerable objections thereto by both defendants).

### The Accident Report: How the accident happened.

The accident report suggests various possibilities as to the cause or causes of the accident. It renders no definitive opinion as to how, in fact, the accident occurred. It assumes that Kropp was improperly trained (not so found by the court); that Kropp actuated the upper hatch handle (not disputed and I so find). It suggests various possibilities as to how Kropp exited the plane through the lower hatch: (1) his body or part of his flight gear hit the lower hatch handle as he entered the companionway during the explosive decompression, thus moving the handle out of the 9 o'clock (closed) position; (2) that Kropp failed to properly lock the lower hatch before take-off; (3) that the handle crept out of the 9 o'clock to an open position (somewhere between the 9 o'clock and 6 o'clock positions) while the plane was taxiing to its take-off point, or during take-off or during flight due to air turbulence. It assumes that the rigging of the lower hatch, including all the associated latch mechanisms, was rigged and operating properly. Thus improper rigging was not mentioned in Little's report as a possible contributing cause of the accident (Ex. 15, p. 6).

### Has the plaintiff established how the accident occurred?

If the lower door were fully locked or in half-latch position and properly rigged, that door could not have opened under the force of explosive decompression (4323). Therefore, either (1) Kropp opened that lower door after the explosive decompression or (2) it was not locked at the time of the accident. These are in effect the only means by which Kropp could have exited the aircraft. The court has considered the evidence bearing upon each of these possibilities and reaches the conclusion that plaintiff has not shown by a fair preponderance of the evidence that any one of them is more likely than the others, which it must do to meet its burden of proof. See Noel v. United Aircraft Corp., 219 F.Supp. 556, 566 (D.Del.1963), aff'd, 342 F.2d 232 (3d Cir. 1964).

(1) Kropp opened the locked lower door after the explosive decompression.

This is the plaintiff's major theory of how the accident occurred. It is mentioned as a possibility in the accident report and Jagger, the plaintiff's expert, testified that this was the first of his possibilities. The fact is that Jagger never did any mathemetical computations to see whether this was, in fact, a viable possibility. Douglas' expert, Harris, testified that it was virtually impossible for Kropp's body to have hit the handle and for him to have exited the plane before the force of explosive decompression dissipated (4321–4325). In other words, by the time Kropp's body reached the handle, the force of the decompression would have dissipated to such an extent that it would have been insufficient to force the lower door open far enough to let him out. This testimony, clearly more credible and scientific than Jagger's, persuades the court that this alleged cause of the accident was unlikely, if not improbable.

(2) Lower door was not locked at time of the accident.

There remains the theory that the door was open, i. e., that either it was not locked prior to take-off or that, somehow, it became unlocked during the flight. Under this theory there are three possibilities. The first of these is handle creep. Plaintiff emphasized this theory and requests a finding that the handle crept. Plaintiff argues that very little force was required to move the lower door handle out of the nine o'clock to the eight o'clock position; the lower door seal was missing, hence the vibrations from the plane during take-off and in flight could have moved that handle

out of the locked into the eight o'clock position during the flight. Plaintiff attempts to bolster this argument with evidence that other A3A's had reported handle creep (Ex. 40), thereby suggesting that creep of the lower hatch handle in this A3A was a cause of the accident.

On the other hand, both experts agreed that, in a properly locked and properly rigged system, that handle will not creep; that a missing lower seal could in time cause the latches to wear and ultimately the handle to creep. However, there is no evidence as to how long that lower seal was missing [3] and, more important, there is no evidence that the latches or any of the cables and pulleys in the system evidenced any wear and tear. In fact, Young's post-flight check on the latches showed that the latches were functioning properly with the exception of the set screws which will be referred to *infra*. While there was evidence that other A3A's had experienced some handle creep, there was no evidence whatsoever as to the cause of such creep in other A3A's and, furthermore, there was no evidence that this A3A ever experienced such creep. To the contrary, Young, who clearly was more familiar with the plane than any other single person, had never heard of any such creep in this A3A and, furthermore, testified that on all his flights the door was always locked when it landed. Runyon also testified that he had never heard of or experienced any

such handle creep on this plane and Kasten testified that he did not recall that his office ever received any information as to any such lower door handle creep in this plane.

On the basis of this evidence, it is impossible to conclude that there was any probability that this accident occurred due to handle creep.

The second possibility is that the rigging of the lower door was improper. After the accident, Young checked the rigging in accordance with the procedures outlined in the HMI. Everything checked out with the exception of the tolerance of the set screws. These two screws are a vital part of the over-centering mechanism of the latches. One screw must touch the rod and the other must be within .003 inches of the rod. All that the evidence indicated was that after the accident, one of those screws was in excess of that tolerance (Ex. I). It does not indicate how far out of that tolerance it was and, without that information, it is impossible to tell whether there is any significant possibility that the over-center mechanism was not functioning during the flight. If it were not, then, even though Kropp may have put the handle in the fully locked position, the latch mechanism may not have over-centered, and it is possible that the explosive decompression force could have opened that lower door if the system were misrigged grossly enough (4233–4285).

3. When the A3A was delivered on January 24, 1964, it received an acceptance inspection by Grumman personnel who noted discrepancies on what is known as a Crab Sheet (Ex. 32). No discrepancies were noted with reference to the lower door seal, the rigging of the hatch system, the door handles, the compartment or cockpit D-Rings. The credible evidence, based upon inspection sheets and crab sheets, is that the lower door seal was not missing and not in inoperative condition when delivered and inspected on January 24, 1964. Nor did the intermediate inspection, made two weeks before the accident (Ex. 31) or the daily inspection made two days before the accident (Ex. 25) indicate that this seal was missing or inoperative. The court refuses to find, as re-

quested by the plaintiff, "That prior to and at the time of such transfer (from the Navy to Bethpage-Peconic) the lower hatch seal was damaged, inoperative and the air-pressure line to this seal was capped off." Rather, the court finds that the lower door seal was in good working order on that date. This seal was capped off and, therefore, inoperative on the day of the accident and presumably for some unknown period after January 24, 1964 and before January 27, 1965. But there is no evidence whatever as to when that seal was capped off. On January 24, 1964 the inspection did reveal that the *upper* door seal was punctured (Ex. 32) and that this discrepancy was corrected, i. e., it was replaced by Grumman (1783, Ex.F).

The third possibility is that Kropp failed to lock the lower door upon entrance into the craft. Harris testified that, in his opinion, this was the most likely cause of how the lower door opened (4527). He explained that it was possible for that lower door to be in the 8 o'clock position (not over-center) and still fair with the fuselage, i. e., not drop from the latches due to the weight of the door (4568–4576). This would account for Young's seeing the door in the faired position on the flight line and the plane director's signal to Runyon to take off (with its implication to him that the doors were closed). This possibility is further enhanced by Jagger's testimony that Kropp was probably excited on his first solo effort aboard the A3A. It is not too remote to believe that, due to his excitement, he failed to put that lower door handle all the way into the closed position and that the latch was not over-center during the flight.[4]

## CONCLUSION

Of the claimed possible causes of the opening of the lower door: (1) Kropp hitting the lower door handle on his way out; (2) handle creep; (3) misrigging of lower door; (4) Kropp's failure to lock it prior to take-off, only the last two are supported, to any degree, by credible evidence in the record. As to these two, it is impossible to determine which, if either, is more probable. The misrigging theory, while possible, cannot be said to be likely, since there is no evidence as to how gross that misrigging was. Without such evidence, it is impossible to discern what effect that misrigging had on the over-centering mechanism of the latches. The failure of Kropp to lock the lower door, as a proximate cause of the accident, stands in inverse proportion to the other possibilities, i. e., the less likely the other possibilities, the more likely this possibility. The accident report, so heavily relied upon by plaintiff, is of no assistance to the court in determining which, if any, of the possible causes of the accident is more than likely correct.[5]

While the court is aware that plaintiff need not eliminate every possible contrary theory as to how the acci-

4. In an apparent attempt to explain the possibility that Kropp did not properly lock that lower door, plaintiff adduced evidence that the HMI (Ex. 22, K) contained an erroneous instruction to the effect that the lower door was to be closed by turning the companionway handle counter-clockwise. This instruction was indeed erroneous. However, the inference plaintiff wishes the court to draw therefrom, that Kropp's failure to lock that door resulted from his following that instruction, is not reasonable. If, in fact, Kropp had followed this instruction, the door, which Young had pushed up to the half-latch (6 o'clock) position, would have cleared the latches and dropped completely open as the handle moved counter-clockwise to the 5 o'clock position and this would have been observable by Young and the plane director. Since this did not occur, it must be assumed that Kropp moved that lower door handle in the proper direction. Thus, even though the instruction was erroneous, it was not followed, and, therefore, could not have been a proximate cause of the accident.

5. In an apparent attempt to buttress Little's report and to persuade the court to give it great weight in its considerations, the plaintiff asks the court (plaintiff's proposed finding of fact number 56) to find that it was "endorsed" not only by Vita but also by the Bureau of Naval Weapons, Fleet Readiness Representative, Atlantic Commander, and the Chief of the Bureau of Naval Weapons. It was so "endorsed". An analysis of the Little report, however, does not support the inference which plaintiff wishes the court to draw from the endorsements.

Little concluded that the accident was caused by Kropp's inadequate training and "probably" by a design deficiency in the lower hatch actuating mechanism (Ex. 15, p. 7). He recommended a complete revision by Grumman of its training program; an alteration in the design or a revision of the rigging instructions as to the lower door "such that the lower hatch cannot be opened by explosive decompression of the cockpit through the upper hatch" (Ex. 15, pp. 7–8); that the NATOPS flight manual contain a specific warning paragraph concerning the dangers of explosive decompression (Ex. 15, pp. 7–8).

An analysis of Little's report, in light of the evidence adduced at trial, reveals

dent occurred, *Noel, supra,* the court must conclude that plaintiff has failed to meet its burden that a fair prepon-derance of the evidence indicates that its theory is more likely correct than the others. *Noel, supra.* Since at least one

that it was not only ambiguous but also that it was incomplete and erroneous in several vital respects. It is ambiguous in that it fails to specify whether he attributed the accident to a "design deficiency" or to the rigging instructions in the HMI. He states that *either* of these should be revised, but does not indicate which. In addition, the "design deficiency", which he states "probably" caused the fatality is not specified, leaving to subsequent endorsers, as well as this court, the unenviable job of speculating as to what he meant by "design deficiency."

Little recommended that the lower door be altered so that it cannot open under the force of explosive decompression. If this was his premise, he was manifestly incorrect, since the evidence at trial (both experts agreed) indicated that if that lower door were properly locked and properly rigged in accordance with the then current HMI instructions, it would not have opened under the force of explosive decompression. Apparently, Little did not know this, which is evidenced by the fact that his report regarding post-light experiments (Ex. 15, pp. 5–7) is silent as to whether decompression tests were conducted with the lower door handle in the 9 o'clock position.

On the other hand, it is conceivable that Little, in speaking of "design deficiency" or altering rigging instructions was concerned with the fact that post-flight tests indicated that very little force was necessary to move the lower door handle from the 9 o'clock to the 8 o'clock position. From this premise, Little seems to have concluded that the accident occurred as a result of the handle already being in the 8 o'clock position or Kropp's body hitting it out of position on the way out (Ex. 15, p. 7).

These possibilities present additional problems. Harris' expert testimony, based on mathematical computations, indicates that the accident could not have occurred by Kropp's body hitting that handle on the way out. Obviously, Little had no such expert advice. As to the claimed possibility that the handle, in effect, crept to the 8 o'clock position, it is noteworthy that Little overlooked more than he considered. To begin with, he assumed that the system was properly rigged, basing this conclusion on post-flight tests. The fact is, as Harris testified, that if the system was so properly rigged, the handle would not creep. Furthermore, as indicated by Young's report (Ex. I), the system *was not* properly rigged because the set screws were not within the required HMI tolerances. Harris testified that, depending on the degree of misrigging, the handle might not have been properly over-centered, and could have opened under the force of explosive decompression. Since Little incorrectly reported that the system was properly rigged, he did not even consider misrigging as a possible cause of the accident. It seems incredible that Young's findings, which were reported in writing, could have escaped Little's attention.

As to handle creep, Little seems content to attribute it solely to the HMI rigging instructions—which were prepared for the Navy by Douglas. It is of more than passing interest that the report is silent as to the inoperative lower seal as a possible cause of handle creep (as so testified at trial), particularly since the HMI required such a seal and also because the Douglas representative, Day, advised Little of the importance of the lower seal, when he came to Bethpage-Peconic during the investigation. When the court considers that the decision to fly the A3A without that seal was a decision made either directly or concurred in by the Navy, it cannot help but conclude, apart from its finding that the evidence adduced on this score was insufficient to make it a proximate cause of the accident, that the report, in omitting any mention of that lower seal, was somewhat less than candid and objective. Little's attempt to place the blame on Grumman for Kropp's inadequate training and its subsequent failure to have him approved have already been discussed at length.

Whatever significance is to be given to subsequent endorsements must be viewed in light of the fact that Little conducted the primary investigation. Since subsequent endorsers were not present during the investigation and did not conduct independent investigations of their own, they obviously had to rely on Little's account of what his investigation disclosed. Therefore, they must have relied on his errors of fact and his omissions. Thus, the mere fact that higher-ups in the Navy chain of command relied on Little in endorsing his report is of no significance to the court, now that it is apparent that the report was poorly done.

of the theories, i. e., Kropp's failure to lock that door, if correct, would be due to his own error and not to the condition of the plane, the court cannot conclude, as requested by plaintiff, that the Government failed to provide Kropp a safe place of work, which duty is not delegable (Proposed Conclusion number 11). This is the only remaining theory of liability as against the Government. Having found no negligence on the part of the Government, it is unnecessary to consider the comparative negligence standard under the DOHSA. It is also unnecessary to consider the statute of limitations applicable to the breach of warranty claims, having found no such breach.

This opinion constitutes the court's findings of fact and conclusions of law. The Clerk is directed to enter judgment for the Government and Douglas.

This is an order.