Agnes M. HARRIS, Widow and Next of
Kin of Robert B. Harris,
Deceased, Plaintiff,

and

Aetna Casualty & Surety Co.,
Intervening Plaintiff,

v.

PETTIBONE CORPORATION, Defend-
ant and Third-Party Plaintiff,

and

United States of America, Defendant and
Third-Party Defendant.

No. CIV–1–78–247.

United States District Court,
E. D. Tennessee, S. D.

March 31, 1980.

John Harber, Robert E. Pryor and Sidney W. Gilreath, Knoxville, Tenn., for Agnes M. Harris.

David L. Franklin, Luther, Anderson, Cleary, Luhowiak & Cooper, Chattanooga, Tenn., for Aetna Cas. & Surety Co., Intervenor.

Thomas O. Helton, Stophel, Caldwell & Heggie, Chattanooga, Tenn., for Pettibone Corp.

John C. Cook, Asst. U. S. Atty., John H. Cary, U. S. Atty., Chattanooga, Tenn., for the U. S.

## MEMORANDUM

FRANK W. WILSON, Chief Judge.

This is an action for the alleged wrongful death of Robert B. Harris, who was killed in an industrial crane accident. Jurisdiction is invoked pursuant to 28 U.S.C. § 1332 and 28 U.S.C. § 1336. This suit was brought by the decedent's spouse, Agnes M. Harris, against the crane manufacturer, Pettibone Corporation. Pettibone impleaded the United States of America, the owner of the crane. The plaintiff then asserted a claim against the United States for negligence pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1336(b) and §§ 2671 et seq., and the United States cross-claimed against Pettibone Corporation for indemnity. The Aetna Casualty & Surety Company has also intervened as a party plaintiff on the grounds that, as workmen's compensation insurer for Mr. Harris' employer, it is subrogated to the rights of the plaintiff to the extent of its workmen's compensation liability. The case is presently before the Court upon a motion for summary judgment filed on behalf of the United States of America. In support of its motion for summary judgment, the United States relies upon the affidavits of James L. Baxter, James E. Fry and Bobby G. Holloway, the exhibits attached thereto, the pleadings in this lawsuit and the stipulation of facts as set forth in the final pre-trial order.

The Court may grant a motion for summary judgment only after having determined that no dispute exists as to any material fact and that the moving party is entitled to judgment as a matter of law. Rule 56(c), F.R.Civ.P. The Court must consider all evidence in the light most favorable to the party opposing the motion. *Bohn Aluminum & Brass Corp. v. Storm King Corp.*, 303 F.2d 425 (6th Cir. 1962). However, when the movant, through affidavits or other admissible evidence, has carried his burden of showing that certain relevant facts are undisputed, the party opposing the motion cannot place those facts in dispute by relying solely upon the allegations in his pleadings. Rule 56(e), F.R. Civ.P.

### I—Undisputed Facts

From the record the following facts appear undisputed. On September 9, 1977 an industrial accident occurred at the Volunteer Army Ammunition Plant (VAAP) located in Hamilton County, Tennessee. The VAAP is owned by the United States of America and, at the time of the accident was operated by ICI Americas, Inc. pursuant to Contract No. DAAA09–73–C–0086. The accident resulted in the death of the plaintiff's decedent, Robert B. Harris.

On the morning of the accident, Mr. Harris, who was employed by ICI as an insulator, was assigned to work with two other ICI employees, James L. Baxter, a crane operator, and J. D. Couey, a laborer. The men were working in the sulphuric acid regeneration area of the VAAP where Mr. Harris was applying insulation to a soda ash storage tank. Mr. Harris began his work by applying insulation to the upper portion of the tank's north side. In order to perform this task, Mr. Harris was suspended in a work cage attached to the extendable boom of a 35-ton crane by a headache ball and hook on the end of an extendable wire cable. The crane was owned by the United States of America and was manufactured by Pettibone Corporation.

When Mr. Harris had completed his work on the north face of the tank he indicated to the crane operator that he wished to be hoisted over the tank to another face so that he could work in that location. To accomplish this maneuver the crane operator had to retract the wire cable, thereby lifting the work cage to a height that was out of his line of vision from his seat in the crane cab. Because he could not see the cage, he requested the laborer assisting in the operation to watch the cage and signal how to operate the crane so as to move the cage into the proper position. It

was standard procedure at the VAAP for such watching and signalling to be performed by a "rigger", a person trained for such work. On the date of the accident the employee performing this function was not a qualified rigger.

During the hoisting maneuver, the crane cable, from which the work cage was suspended, broke and the cage containing Mr. Harris fell to the ground. Mr. Harris died several hours after the accident.

While the exact cause of the accident is not altogether clear, from the record, it appears that the accident may have resulted from an occurrence known as "two-blocking". Two-blocking occurs when the end connection on the crane cable, in this case the headache ball, comes in contact with the crane gib, the end portion of the extendable boom. Once this occurs, if the cable is further retracted, the gib folds upward and stress is placed upon the cable at the point where it passes under a guide plate at the end of the boom. The result is that the cable breaks.

It is undisputed that at all times relevant to this lawsuit there existed a contract between the United States Army and ICI pursuant to which ICI operated the VAAP. This contract contains the following provisions relevant to the issues raised in the lawsuit:

Article E–2–1 provides in relevant part: "The Contractor, as an independent contractor and not as an agent of the Government, shall upon the terms, conditions, and provisions herein set forth furnish all personnel, labor, equipment, supplies, material, consultation, engineering and other services, except such of the foregoing as may be furnished by the Government, sufficient and adequate to operate and maintain the Volunteer Army Ammunition Plant for the purpose therefor established. In furtherance thereof and to the extent that funds are made available by the Government, the Contractor shall perform the following:

\*　　\*　　\*　　\*　　\*　　\*

"B. Training of Contractor and Government personnel at the plant or elsewhere.

\*　　\*　　\*　　\*　　\*　　\*

"J. Maintenance of the plant and portions thereof in accordance with appropriate standards of maintenance approved by the Contracting Officer."

Article E–2–7 provides in relevant part:

"In carrying out the work hereunder, the Contractor is authorized to do all things reasonably necessary for the proper operation of the plant, including, without limitation:

"A. The employment of all necessary personnel, who shall constitute employees of the Contractor and not of the Government" (*Id.* at p. 9)

Article J–12 deals with the authority of government representatives and provides that the authorized representative of the Contracting Officer may authorize contract changes. However, Article J–12 further provides in relevant part that:

"No other Government representative, .　.　. is authorized to make any commitment to the Contractor, to instruct the Contractor to perform or terminate any work, or to incur any obligation." (*Id.* at p. 49)

Article L–18(F) governs the maintenance and repair of government property and provides in relevant part:

"The Contractor shall maintain and administer, in accordance with sound industrial practice, and in accordance with applicable provisions of Appendix B, a program for the utilization, maintenance, repair, protection and preservation of Government property so as to assure its full availability and usefulness for the performance of this contract." (*Id.* at p. 91)

Finally, Article J–9 governs safety and provides in relevant part:

"It is the understanding and intent of the contracting parties that the Contractor shall utilize AMCR 385–100, Safety Manual, dated April 1970, and Change No. 1 dated October 1971, as the implementation instructions and operational guide for the safety requirements under the

contract which will result from this solicitation. The Contractor shall also comply with all applicable provisions of local, State, and Federal ordinances, laws and building and construction codes." (*Id.* at p. 46)

The portion of Safety Manual No. AMCR 385–100 which is relevant to this lawsuit is Section 1–16(B), which provides:

"Once the hazards of a particular operation have been identified, they shall be evaluated in order to facilitate correction. The specific preventative or control measures to be applied shall be determined by the characteristics peculiar to the hazard. The solution may be found in education of personnel, in use of protective equipment, or in engineering changes involving equipment or processes. The lack of existing regulations or standards does not relieve the Commander of responsibility for developing local measures for the control of recognized hazards."

Pursuant to the contract, ICI implemented a comprehensive safety plan providing for safety education, hazard identification in the form of accident investigation and reporting, and review of safety plans. In addition, the United States employed a Safety Director for the VAAP. Mr. Bobby G. Holloway has served as Safety Director from 1974 to the present. Mr. Holloway's affidavit, which is undisputed in the record, discloses that as Safety Director he has always been responsible for monitoring the work safety procedures of ICI to insure contract compliance. Pursuant to this responsibility, Mr. Holloway has performed random spot checks of ICI job sites to determine if contract safety requirements were being met. However, Mr. Holloway's authority as Safety Director has not included the authority to direct or supervise any ICI employee in the performance of work at the VAAP. Nor has Mr. Holloway ever directed or supervised ICI employees. When Mr. Holloway's spot checks disclosed conditions in violation of contract safety requirements, Mr. Holloway, pursuant to his duty, reported such violations to the Commander's Representative so that appropriate action could be taken to inform ICI of the problem.

On the day of the crane accident, the job site where the accident occurred was in the complete control of ICI. Mr. Holloway was not at the job site at the time of the accident or at any earlier time that day. Further, no Army employee was observed at the job site on the day of the accident at any time prior to the accident.

From the record there are other relevant facts that appear undisputed. It is undisputed that in March of 1977, six months before the accident, the United States Army decided to discontinue production of TNT at the VAAP. As a result, ICI reduced its work force from approximately 500 employees to 200 employees. However, the decision as to what employees to retain was made by ICI alone. Further, while it appears that ICI supervisors may have instructed ICI employees that they might need to be more flexible in their job responsibilities, it is undisputed that the United States did not instruct ICI or its employees that the employees would have to be more flexible in their job responsibilities. From 1966 until December of 1977, Mr. James E. Fry was employed by the United States Army as the Commander's Representative and Contracting Officer's Representative at the VAAP. Mr. Fry was an administrator and was responsible for the surveillance and review of ICI performance pursuant to the contract between ICI and the United States Army. From the affidavit of James E. Fry it appears undisputed that during his employment at the VAAP, no accident had been reported as being caused by two-blocking a crane, nor had any instance been reported where a crane was being operated without a rigger.

## II—*Contentions of the Parties*

The plaintiffs contend that ICI was an agent of the United States and therefore the United States is liable for the negligence of ICI in the setup, supervision, and operation of the crane and the negligence of ICI in assigning untrained personnel to operate the crane. In the alternative, the plaintiffs contend that, if the ICI was an

independent contractor, the United States by its own negligence breached the duty it had assumed to inspect and supervise the safety of ICI employees at the VAAP or that the United States by its own negligence breached a non-delegable duty to avoid mischievous consequences by seeing that appropriate safety measures were taken regarding the use of the crane, the condition of the crane, and the nature of the work to be performed with the crane.

The defendant/third-party plaintiff, Pettibone, contends that if it is liable unto the plaintiff, the United States is liable unto it under an indemnity theory because the negligence of the United States' agent, ICI, was the active proximate cause of the plaintiff's injury. Alternatively, Pettibone contends that, if the ICI was an independent contractor, the United States is still liable unto Pettibone because the United States itself breached either its assumed or its non-delegable duty to see that appropriate safety measures were taken regarding the use and condition of the crane. Pettibone contends that the United States' negligence was the active proximate cause of the plaintiff's injury.

The United States denies that it is liable unto the plaintiff or Pettibone Corporation. The United States contends that ICI was not an agent of the United States but was instead an independent contractor and that the United States is not liable for the negligent acts of its independent contractors. Further, the United States contends that it did not assume any duty to see that appropriate safety measures were taken with regard to the condition or use of the crane or with regard to the work to be performed by the crane. Finally, the United States contends that the conditions at the VAAP and the conditions under which the crane was used were not circumstances under which mischievous consequences were reasonably foreseeable by the United States and therefore a non-delegable duty requiring the United States to oversee the safe condition and use of the crane did not arise.

## III—*Liability of the United States*

The claims against the United States are brought pursuant to the Federal Tort Claims Act (28 U.S.C. § 1346(b) and §§ 2671 *et seq.*). Section 1346(b) provides that the United States is subject to liability for wrongful death:

"[C]aused by the negligence or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

Accordingly, Tennessee law governs the liability of the United States to the extent that liability is not directly controlled by the Federal Tort Claims Act.

Subsection 1346(b) of Title 28 United States Code imposes liability upon the United States for the negligence of employees of the Government. The term "employee of the Government" as used in subsection 1346(b) is defined by 28 U.S.C. § 2671, which provides in relevant part:

" 'Employee of the Government' includes officers or employees of any federal agency, members of the military or naval forces of the United States, and persons acting on behalf of a federal agency in an official capacity."

Section 2671 also defines the term "federal agency" as including

"[T]he executive department, the military departments, independent establishments of the United States, incorporations primarily acting as instrumentalities or agencies of the United States, but does not include any contractor with the United States."

Therefore, while the United States may be liable for the negligent acts or omissions of its employees or agencies, the United States is not liable for the negligent acts of its independent contractors or their employees. *Logue v. United States*, 412 U.S. 521, 93 S.Ct. 2215, 37 L.Ed.2d 121 (1973). Accordingly, the first issue to be determined by this Court is whether ICI was an agent or a contractor of the United States.

### A—*Vicarious Liability*

■ In *Logue v. United States, supra,* the Supreme Court stated that the contractor is to be distinguished from the agent by "the absence of authority in the principal to control the physical conduct of the contractor in the performance of the contract." *Id.,* 412 U.S. at 527, 93 S.Ct. at 2219, 37 L.Ed.2d at 128; *accord Bush Bros. & Co. v. Hickey,* 223 F.2d 425 (6th Cir. 1955) [applying Tennessee law]; *Texas Co. v. Bryant,* 178 Tenn. 1, 152 S.W.2d 627 (1941). It is the degree of control which the Government exercised or had the right to exercise over the Contractor that determines the Government's liability or non-liability for the Contractor's negligence.

■ The case of *Kropp v. Douglas Aircraft Co.,* 329 F.Supp. 447 (E.D.N.Y.1971) provides an excellent discussion of the types of government control that may be exercised without imposing liability upon the Government. In *Kropp,* the Court noted that in awarding a contract to a private concern the Government will usually receive a right of general supervision in order to assure that contract obligations are being met. This power of general supervision does not, however, constitute control over the Contractor sufficient to make the Contractor an agent. *Id.* at 468–69; *Mahoney v. United States,* 216 F.Supp. 523, 528 (E.D. Tenn.1962). Although the Government may establish safety standards and reserve the right to inspect for compliance with those standards, such provisions in a contract do not make the Contractor a government agent. *Craghead v. U. S.,* 423 F.2d 664 (10th Cir. 1970); *United States v. Page,* 350 F.2d 28 (10th Cir. 1965); *see Kropp v. Douglas Aircraft Co., supra* at 469. The Contractor becomes a Government agent only when the Government assumes the Contractor's contractual obligations or actually directs the performance of the Contractor or his employees. *Buchanan v. United States,* 305 F.2d 738 (8th Cir. 1962); *Kropp v. Douglas Aircraft Co., supra; see Mahoney v. United States, supra.*

■ In the present case it is undisputed that a contract existed between the United States and ICI whereby the parties agreed that ICI would operate the VAAP as an independent contractor. The contract by its terms provided that ICI would furnish all personnel, labor, equipment, supplies, material, consultation, engineering and other services sufficient to operate and maintain the VAAP. ICI was responsible for hiring and training all personnel and the contract provided that any employee so hired was to be regarded as an employee of ICI. Further, ICI was responsible for maintaining the plant and its equipment ICI was also charged with the responsibility of implementing safety procedures in accordance with federal standards. While the contract provided that the Contracting Officer authorize all contract changes, all other government representatives were prohibited from instructing the Contractor to perform or terminate any work. Further, from the record it is undisputed that, at all times relevant to this lawsuit, no government agent, representative or employee had any responsibility for or exercised any control over the day to day operations of the VAAP. While Mr. Holloway, as Safety Director, made spot checks of job sites from time to time, these checks were made to determine whether ICI was complying with contract requirements and Mr. Holloway at no time supervised ICI employees on a job site. In addition, on the day of the accident, the job site where Mr. Harris was injured was in the complete control of ICI.

Based upon the undisputed facts, it is apparent that, both as a matter of contract obligation and as a matter of actual practice, ICI was responsible for maintenance of the crane and operation of the crane at the job site. Further, ICI was responsible for assigning its employees to job sites and supervising their conduct while on the job. The undisputed facts further establish that the United States never sought to exercise the contractual responsibilities imposed upon ICI. While the United States retained general supervisory power in order to see that ICI performed its contractual obligations, this general power of supervision did not render ICI an agent of the

United States. Rather, it appears undisputed in this record that ICI was an independent contractor of the United States. Therefore, the United States would not be liable under the Tort Claims Act for the negligence, if any, on the part of ICI or its employees in connection with the accident.

### B—*Direct Liability*

While the Court has determined that the United States cannot be held liable for the negligent acts of ICI, the question remains as to whether the United States itself committed any acts of negligence for which it might be held liable. It is basic to the law of negligence that in order for an alleged tortfeasor to be held liable for negligence, he must have owed some duty to the plaintiff and have breached that duty.

The plaintiff and Pettibone contend that the United States owed a duty to inspect and supervise the operation of the crane and the condition of the crane in order to provide for the safety of the plaintiff. The plaintiff and Pettibone contend that such a duty existed either because the United States assumed the duty by requiring that certain safety measures be met and by reserving the right to inspect safety procedures or because due to the nature of the plaintiff's work a non-delegable duty arose to provide for his safety.

■ The Court turns first to the contention that the United States assumed a duty toward the plaintiff. As a general rule when the contract between the Government and its Contractor places a responsibility for safety upon the Contractor, the Government is not deemed to have assumed a duty to provide for the safety of the Contractor's employees, although the Government, by contract, requires that certain safety standards be met and the Government reserves the right to inspect for compliance. *Roberson v. U. S.,* 382 F.2d 714 (9th Cir. 1967); *Grogan v. U. S.,* 341 F.2d 39 (6th Cir. 1965); *Musgrave v. T. V. A.,* 391 F.Supp. 1330 (M.D.Ala.1975); *Rogers v. T. V. A.,* No. 1–76–320 (E.D.Tenn. March 3, 1977). However, this rule does not apply when the government standards and inspections are provided for the specific purpose of benefitting the Contractor's employees, *Roberson v. U. S., supra; Musgrave v. T. V. A., supra,* or when the Government by contract reserves to itself the power to control safety by supervision and inspection or where the Government by its own actions undertakes to itself fulfil the contractual obligations of the Contractor to control safety by supervision and inspection. *See Musgrave v. T. V. A., supra* at 1331; *Kropp v. Douglas Aircraft Co., supra* at 469.

■ In the present case, it is undisputed that the contract between the United States and ICI set out certain safety requirements and charged ICI with the responsibility of meeting those requirements. Pursuant to its contractual obligation, ICI set up a safety program for implementation of safety rules, maintenance of safety on the job, safety review and safety education. Although the Government retained a right to conduct safety inspections, it is undisputed that the Government Safety Director performed only spot checks of job sites for the purpose of determining whether the contract safety standards were being observed. Any safety hazards observed were reported to the Commander's Representative to be passed on to ICI. Under these circumstances the Court is of the opinion the contractually imposed safety standards and government inspections were as a matter of law for the benefit of the Government only and were intended to provide the Government with a method for securing appropriate performance of the work for which it contracted. *See Roberson v. United States, supra; Rogers v. T. V. A., supra; Musgrave v. T. V. A., supra.*

However, the plaintiff and Pettibone rely upon the Government's Safety Manual referred to in Article J–9 of the ICI-Government contract contending that ¶¶ 1–16B of the manual placed a duty upon the Commander's Representative to promulgate rules for safety and therefore the United States assumed a duty under the contract to inspect and supervise the safety of ICI employees. The Court finds this contention without merit. As previously noted,

"Article J–9 provides in relevant part:

"It is the understanding and intent of the contracting parties that the Contractor shall utilize AMCR 385–100 Safety Manual, . . . as the implementation instructions and operational guide for the safety requirements under the contract which will result from this solicitation."

While ¶ 1–16 of the Safety Manual provides in relevant part:

"B.  Once the hazards of a particular operation have been identified, they shall be evaluated in order to facilitate the correction.  The specific preventative or control measures to be applied shall be determined by the characteristics peculiar to the hazard . . . . The lack of existing regulation or standards does not relieve the Commander of responsibility for developing local measures for the control of recognized hazards."

The Court is of the opinion that Article J–9 provides reference to the Safety Manual solely as a guide to the Contractor for ascertaining his safety obligations under the contract and for providing the method to be used in implementing those requirements. The Safety Manual is not referred to in a manner which would indicate that it in any way creates additional duties on the part of the Government not already imposed by the contract itself.  Even if the Safety Manual is considered as creating some responsibility on the part of the Commander's Representative, that responsibility is limited to the promulgation of rules and does not extend to a responsibility to inspect or supervise the safety of work performed by ICI employees.  Further, any rules promulgated by the Commander's Representative would be supplemental to the safety requirements already existing in the contract.  Since the Court has previously determined that the safety requirements imposed by the contract were as a matter of law for the benefit of the Government in obtaining appropriate performance of the contracted for work and not for the benefit of ICI employees, the failure of the Commander's Representative to promulgate rules regarding crane safety (if such a failure occurred) would not impose liability upon the United States.

Accordingly, the Court concludes that, based upon the undisputed facts, the Government did not by its contract assume any obligation extending to the employees of ICI to supervise the safety of ICI's contract performance.  Nor did the Government by its actions assume a responsibility for controlling safety by supervision and inspection.  To conclude that the United States had assumed such extensive control over safety would be inconsistent with the undisputed facts and with the Court's conclusion that ICI was an independent contractor.

■ The Court now turns to the contention of the plaintiff and Pettibone that the Government had a non-delegable duty to supervise and inspect the operation of the crane.  Under the law of Tennessee, a non-delegable duty on the part of the employer of an independent contractor arises when, due to the nature of the work being performed by the contractor, mischievous consequences may reasonably be expected to arise unless means are adopted to prevent them.  *Coursey v. Morgan Driveway, Inc.,* 366 F.2d 504 (6th Cir. 1966); *Rogers v. T. V. A., supra; International Harvester Co. v. Sartain,* 32 Tenn.App. 425, 222 S.W.2d 854 (1948).  The mischievous consequence doctrine is generally applied where the activity to be performed is inherently dangerous, *see Kuhne v. United States,* 267 F.Supp. 649 (E.D.Tenn.1967); *Kemp v. Knox County,* 556 S.W.2d 546 (Tenn.App.1976), or the circumstances under which the activity is to be performed create an inherent risk of danger.  *International Harvester Co. v. Sartain, supra.*

■ The activity giving rise to this lawsuit involves the use of a crane to apply insulation to a soda ash storage tank.  Although there is at least one case cited in which liability was imposed where a crane was operated in close proximity to electrical wires, an inherently dangerous instrumentality, *Acuff v. Commissioner of Tennessee Department of Labor,* 554 S.W.2d 627 (Tenn.1977), the Court has been directed to no case holding that the operation of a

crane under the circumstances here shown is an inherently dangerous activity. Accordingly, it is the opinion of this Court that the use of a crane to apply insulation to a soda ash storage tank was not an inherently dangerous activity falling within the mischievous consequences exception.

The plaintiff and Pettibone contend, however, that the circumstances existing at the VAAP upon the day of the accident were such that mischievous consequences were foreseeable from the operation of the crane. This contention is based upon the fact that in March of 1977 the Government decided to discontinue production of TNT at the VAAP. As a result, ICI cut back its work force from approximately 500 employees to approximately 200. The plaintiff and Pettibone apparently contend that the reduction in the ICI work force made it foreseeable that job sites might be understaffed or staffed with untrained personnel, creating situations in which mischievous consequences might arise. The Court is of the opinion that this contention is without merit. Arguably, a dangerous situation may be foreseeable when work that is dangerous when performed without adequate staff or with untrained staff is so performed. However, a reduction in staff without more does not make it foreseeable that work will be performed by an untrained staff. It is undisputed that the United States did not conduct the cut-back of the ICI work force, nor did the United States ever suggest to ICI or any of its employees that the employees be more flexible in their job responsibilities. Further, there is nothing in the record to indicate that the VAAP was understaffed or that on any occasion other than the day of the accident an ICI employee had performed a job for which he was not qualified. Since no representative of the United States was present at the job site where the plaintiff was killed prior to the time of the plaintiff's death, there is no basis upon which the Court may conclude that the United States knew or had reason to know of any circumstance making it reasonably foreseeable that the operation of the crane on the day of the plaintiff's death would result in mischievous consequences.

Accordingly, the Court concludes that the United States had no non-delegable duty to provide for the safety of the plaintiff by supervising the operation of the crane.

In summary, the Court concludes:

(1) That ICI was an independent contractor of the United States Government and therefore the Government is not liable for any acts of negligence on the part of ICI;

(2) That the Government did not assume or breach any duty for which it could be held legally liable for the accident which occasioned the death of the plaintiff's decedent; and

(3) That neither the nature of the work performed nor the circumstances existing at the VAAP upon the date of the accident imposed a non-delegable duty upon the United States to provide for the safety of ICI employees. Accordingly, the Court will grant the motion of the United States for summary judgment and dismiss all claims by the plaintiff and Pettibone against the United States. Further, the Court will dismiss the United States' cross-claim against Pettibone since the cross-claim is one for indemnity and upon dismissal of the plaintiff's claims against the United States, the basis for the cross-claim will cease to exist.

An order will enter accordingly.