**John F. O'NEILL, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**CV 94–5349 (ADS).**

United States District Court,
E.D. New York.

June 12, 1996.

600

Gandin, Schotsky & Rappaport, P.C., Melville, New York (Michael I. Gandin, of counsel), for plaintiff.

Zachary W. Carter, United States Attorney, Brooklyn, New York (by Scott Dunn, Christopher Lehmann, Asst. U.S. Attys., Mary Elizabeth Tibbetts, Special Asst. U.S. Atty.), for defendant.

### MEMORANDUM and DECISION

SPATT, District Judge.

This is an action brought under the Federal Tort Claims Act ("FTCA" or "Act") 28 U.S.C. § 1346(b), to recover damages for personal injuries sustained by the plaintiff John O'Neill ("the plaintiff" or "O'Neill") in the boiler room at the Holtsville facility of the Internal Revenue Service ("IRS"). This decision follows a bench trial conducted on May 3, May 8, May 9 and June 6, 1996.

### I. THE TRIAL—FINDINGS OF FACT

This opinion and order includes the Court's findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a). See *Colonial Exchange Ltd. Partnership v. Continental Casualty Co.*, 923 F.2d 257 (2d Cir.1991). During this discussion the Court will make findings of fact, which will be supplemented by additional findings later in the opinion.

On June 19, 1975, the United States of America entered into a Supplemental Agreement to an existing lease with the Town of Brookhaven, involving the IRS facility at Holtsville (Plaintiff's Exh. 1). This agreement provided in part:

2. *MAINTENANCE OF PREMISES*

The Lessor shall deliver and the Government shall receive the land, buildings, equipment and facilities of the IRS–ADP Center in their then-existing condition. The Government shall maintain the demised premises, including the buildings and any and all equipment, fixtures, facili-

ties, landscaping, and appurtenances furnished by the Lessor under this supplemental Agreement in good repair and tenantable condition, except in the case of damage arising from the acts or negligence of the Lessor's agents or employees. For the purpose of so maintaining said premises and property, the Government may enter and inspect the same and make any necessary repairs thereto.

. . . .

B.17. It is the understanding of the parties hereto that, by execution of this Supplemental Agreement No. 4, the Government shall assume full responsibility for, and pay all costs incidental to the operating, maintenance and repair of, the entire facility, including all services connected therewith both on and off the premises.

In turn, the IRS retained independent contractors to maintain and repair the leased premises at Holtsville. One such contractor is the Ogden–Allied Service Corporation ("Ogden–Allied" or "contractor"). A modification to the maintenance contract dated February 24, 1989 (Plaintiff's Exh. 2) provided, in part, as follows:

Contractor shall provide all supervision, management, labor, materials, equipment, etc. for the operation and maintenance of all mechanical, and utility systems and subsystems at the Brookhaven Service Center, described in Solicitation No. 87–044 dated 4/1/87. (P. 000022).

. . . .

1. *Scope of Work.*

A. The contractor shall provide all management, supervision, labor, materials, supplies, repair parts, tools, and equipment, and shall plan, schedule, coordinate and ensure effective and economical completion of all work and services specified in this contract. (P. 000044).

. . . .

F. *Repairs*

(1) *Minor Repairs.* As a part of the services provided under this contract, the contractor shall perform all repairs necessary to prevent the breakdown or failure of a piece of equipment. Minor repairs are defined as unanticipated and unscheduled work required to prevent the breakdown or failure of a piece of equipment or a system; or to put back into service after a breakdown or failure a piece of equipment or a system where the cost labor, materials, and parts is expected to be $7,500.00 or less. This dollar threshold applies to each individual repair job that may be required. The contractor shall immediately perform necessary repairs when they are required in order to ensure continuity of operations, or to return equipment to service as soon as possible. The COTR shall be advised that the repairs are being accomplished. Work should not be delayed in order to notify the COTR, except where guarantees or warranties are involved in which case the COTR shall be notified prior to repairs being made. All parts shall be approved by the COTR. (P. 000047).

. . . .

1. *The Role of IRS Personnel in Contract Administration.*

. . . .

B. *Contracting Officer's Technical Representative, (COTR).*

The above named individual is hereby designated as the COTR. The responsibilities of the COTR include, determining the adequacy of performance by the contractor in accordance with the terms and conditions of this contract; inspecting and accepting work performed, and services delivered; acting as the Government's representative to ensure compliance with contract requirements insofar as the work is concerned; advising the contractor of nonperformance or unsatisfactory performance; and advising the contracting officer of any factors which may cause delay in performance of the work. (P. 000057).

. . . .

D. *Contract Inspectors.* Contract inspectors are subordinates of the COTR and are responsible for the day-to-day inspection and monitoring of the contractors work. The responsibilities of the contract inspector includes, but are not limited to: inspecting the work to ensure compliance with the contract requirements; documenting through to assure that all defects or

omissions are corrected; conferring with representatives of the contractor regarding any problems encountered in the performance of the work and generally assisting the COTR in carrying out his responsibilities.

2. *Government Inspection of Service.* All services, which include services performed, material furnished or utilized in the performance of services, and workmanship in the performance of services, shall be subject to inspection and test by the Government, to the extent practicable, at all times and places during the terms of the contract. All inspections by the Government shall be made in such a manner as not to unduly delay the work. (P. 000058).

The plaintiff John O'Neill was employed by Ogden–Allied in 1987 to work at Holtsville as a watch engineer. He had done this work for Ogden–Allied and other contractors for more than twenty years. The duties of a watch engineer consist, as the name implies, of taking readings and visual checking certain areas of the Holtsville facility, including the boiler room. O'Neill worked a night shift from 12:00 midnight to 8:00 a.m. He checked the plant, made hourly readings and also performed preventive maintenance work. On the date of this occurrence he was taking hourly readings of the meters in the boiler room. He did this approximately eight times a shift.

On May 5, 1993 at approximately 2:30 a.m., O'Neill entered the boiler room and was going to check the fuel oil readings, when he tripped on the "blow-down" pipes located on the floor between the two boilers. (See photographs, Plaintiff's Exhs. 3 to 6, and 7A to 7Q). "Blow-down" pipes or lines are connected to the boilers and are designed to relieve the pressure in the boilers, acting as a drain from the boilers. Douglas Pavon, the engineer who worked on the design of the boiler room testified that the blow-down pipes are designed to dispose of stale and dissolved solids and sediment from the water in the boiler. According to Pavon, the ports from which the waste material leaves the boiler and goes into the blow-down pipes must be located at the bottom of the boiler, and, therefore, the blow-down pipes usually run along the floor. He also stated that the blow-down pipes cannot be buried in concrete because the heat generated in the pipes would crack the concrete. Also, according to Pavon, if the pipes were placed in trenches, this would lead to a collection of debris and oil, which would be a fire hazard. In sum, Pavon testified that blow-down pipes on the floor are a necessary component in a boiler room and the blow-down pipes at issue were not unusual in design and complied with the applicable codes.

However, according to Dr. William Marletta, a safety engineer produced by the plaintiff who inspected the boiler room, the blow-down pipes were 2½ inches above the floor level, which was contrary to good and accepted standards and practice and constituted a hazard.

The plaintiff testified that he tripped and fell over the same blow-down pipes five or six times prior to this occurrence. He stated that formerly there was a plywood stepover ramp over the pipe, which safeguarded the area. However this plywood protective ramp had been missing for about ten years. The plaintiff complained about the blow-down pipes being a safety hazard five or six times to his employer, Ogden–Allied. He also complained to three IRS employees, William Boeklin, James Darling and Bob Peru. He made these complaints to the IRS personnel on prior occasions when he tripped over the pipes about a year before the accident of May 5, 1993. He also complained about "difficult" lighting in the boiler room.

The Court finds that the placement of the blow-down pipes on the floor of the boiler room rising to a level of 2½ inches over the level of the floor, constituted a dangerous condition. While the Court does not credit the testimony of the plaintiff with regard to actual notice to the IRS, the Court finds that the IRS had constructive notice of this dangerous condition on the boiler room floor. In addition, the Court finds that the plaintiff tripped over the blow-down pipes on May 5, 1993 at approximately 2:30 a.m., in the manner he described. The plaintiff's version is supported by the Ogden–Allied Daily Log, which confirms the happening of this occurrence (Plaintiff's Exh. 15).

The plaintiff testified that he fell forward and his head, shoulder, hip, hands, elbows and arm struck the ground and other piping. He stated that he was out of work for six or seven days and returned to work on May 12, 1993. The plaintiff worked to October 16, 1993 and never returned to work with Ogden–Allied or in any other employment after that date. However, contrary to the plaintiff's testimony, the Court finds that the plaintiff returned to work the day after the accident and worked to October 16, 1993.

The damages issues in this case are unclear. O'Neill had major medical problems prior to this accident. In August 1990 he underwent a cervical laminectomy, which was performed by Dr. Allan Zippin. He was out of work for eight months after this major surgery. Prior to this accident the plaintiff was having difficulty in walking, staggered on occasion and had a problem with his equilibrium. Also, the plaintiff had slight pain and tingling in his hands prior to this occurrence. In addition, O'Neill had a drinking problem for many years. In some of his physicians' reports it was stated that he consumed large quantities of alcohol, from one to three quarts on weekends, and other heavy alcohol ingestion during the week.

The plaintiff claims that, as a result of the fall, he sustained multiple injuries to his neck, shoulders, lower back, right hip, right leg, right ankle and radiating pain into his arms and hands. He was treated by Dr. Harvey Lerner, his family doctor on five or six occasions; by Dr. Allan Zippin, the neurosurgeon who previously operated on his cervical spine, on seven occasions; by Dr. Salvatore Inserra, an orthopedic surgeon on twenty occasions; and by Dr. Mark Zuckerman, a neurologist about eight times. On August 6, 1994, the plaintiff was operated on by Dr. Inserra for a carpal tunnel syndrome condition.

Despite the fact that the plaintiff was treated by a battery of physicians, only Dr. Zuckerman testified. Although there is no duty on a party to produce any particular witness, the plaintiff's other treating physicians were in a position to give material noncumulative testimony on the issue of the plaintiff's prior injuries and the injuries sustained in this occurrence. Furthermore, the plaintiff was in the best position to produce his own physicians. Accordingly, if the issues of injuries and damages were to be addressed, the Court would draw the inference that the testimony of Dr. Lerner, Dr. Zippin and Dr. Inserra would have been unfavorable to the plaintiff on these issues. See *U.S. v. Ouimette,* 798 F.2d 47, 49–50 (2d Cir.1986) *cert. denied,* 488 U.S. 863, 109 S.Ct. 163, 102 L.Ed.2d 134 (1988).

However, the Court need not delve into the difficult question involving the injuries and damages sustained by the plaintiff in this occurrence, because the plaintiff failed to prove any responsibility on the part of the IRS, as will be described later in the opinion.

### DISCUSSION

The FTCA is a limited waiver of the sovereign immunity of the United States. This Act provides for lawsuits against the United States for injuries "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment...." 28 U.S.C. § 1346(b) (1982). The Act defines "employee of the government" to include "officers and employees of any federal agency," and specifically *excludes* "any contractor with the United States" from the definition of "federal agency." 28 U.S.C. § 2671 (1982). Thus, if the accident was caused by the negligence of a contractor, rather than the IRS, the United States is immune from suit.

In the seminal case of *United States v. Orleans,* 425 U.S. 807, 814, 96 S.Ct. 1971, 1976, 48 L.Ed.2d 390 (1976) (quoting from *Logue v. United States,* 412 U.S. 521, 528, 93 S.Ct. 2215, 2219, 37 L.Ed.2d 121 (1973)), the Supreme Court set forth the standard to be applied in delineating the responsibilities of a federal agency from an independent contractor: "A critical element ... is the power of the Federal Government 'to control the detailed physical performance of the contractor.' "

### I. *The Liability Issues*

There are two liability issues in this case. First, is there any liability on the part of the

IRS, as a result of the negligent acts of Ogden–Allied? Second, did the IRS have an independent duty to maintain and safeguard the blow-down pipes at issue in this case.

## II. *Is the IRS Liable for the Negligent Acts of Ogden–Allied?*

In this case, there is no question that Ogden–Allied Service Corp. acted as an independent contractor in its duties at the Holtsville IRS facility. Indeed, plaintiff's counsel states in his memorandum of law, page 1, that the plaintiff as a watch engineer for Ogden–Allied "was responsible for the running of the mechanical rooms." Further, the Court finds that Ogden–Allied was not an agent of the IRS. For purposes of the FTCA, the common law of torts and agency defines the distinction between an independent contractor (for whose torts the Government is not responsible) and an employee, servant or agent (for whose torts the Government is responsible). As stated above, courts have found it indicative of an agency relationship if the Government enjoys the "power 'to control the detailed physical performance of the contractor,' " *United States v. Orleans, supra,* 425 U.S. at 814, 96 S.Ct. at 1976 (quoting *Logue v. United States,* 412 U.S. at 528, 93 S.Ct. at 2219). See also *Logue,* 412 U.S. at 528, 93 S.Ct. at 2219; *Leone v. United States of America,* 910 F.2d 46, 50 (2d Cir.1990) *cert. denied,* 499 U.S. 905, 111 S.Ct. 1103, 113 L.Ed.2d 213 (1991); *Letnes v. United States of America,* 820 F.2d 1517, 1518 (9th Cir.1987).

The undisputed evidence in this case establishes that, in its activities with regard to the IRS boiler room, Ogden–Allied was an independent contractor. Ogden–Allied agreed to provide "all supervision, management, labor, material, equipment, etc. for the operation and maintenance of all mechanical ... systems at the Brookhaven Service Center." Ogden–Allied further agreed to provide "all management, supervision, labor, materials, supplies, repair parts, tools and equipment," and to "plan, schedule, coordinate and ensure effective and economical completion of all work and service specified in the contract." In addition, Ogden–Allied agreed to perform "all repairs necessary to prevent the breakdown or failure of a piece of equipment," including the blow-down pipes involved in this case. The only involvement of IRS in this regard is to be "advised that the repairs are being accomplished."

As to the maintenance of the IRS boiler room and its appurtenances, including the blow-down pipes, the IRS did not assume control over and did not direct or supervise the Ogden–Allied work. Daniel F. Gearon was the IRS Chief of Operations and Maintenance Section in Holbrook in May 1993. He testified about the duties of Ogden–Allied and the IRS with regard to the boiler room, as follows:

Q  Would you briefly describe the nature of the interaction that occurred between the IRS and Ogden at the facility.

A  Ogden did the—they ran the building. They did the maintenance. We inspected them and we just evaluated our inspections as against their performance.

Q  Now, would an IRS employee ever involve himself or herself in involving any physical labor with Ogden?

A  No.

Q  Would an IRS employee ever direct an Ogden employee how to maintain the premises?

A  No.

Q  Would an IRS employee ever supervise an Ogden employee as to that employee performing maintenance functions?

A  No.

Q  Did an Ogden employee performing maintenance functions ever directly report to an IRS employee?

A  No.

Q  Now, did Ogden have an office in the total energy plant?

A  Yes.

Q  And did they have employees in that office?

A  Yes.

Q  Did IRS, have an office (sic) the total energy plant?

A  No.

Q  And did there come a time when IRS employees would visit the total energy plant?

A Yes.

Q And what would the purpose be in visiting the total energy plant?

A Daily they would check the logs to see if everything was running smoothly and check the machinery to see if preventive maintenance programs were being kept up.

. . . .

Q If problems were identified to an employee of Ogden–Allied would an IRS ever supervise the Ogden employee as those problems were rectified?

A No.

Q Under such circumstances as I described, would an IRS employee ever involve himself or herself in the physical labor necessary to correct those problems?

A No.

Q And would an IRS employee ever direct the Ogden employee how to rectify those problems?

A No.

Q Are you familiar with the boiler room at the IRS facility?

A Yes.

Q Are you familiar with the boiler in that room?

A Yes.

Q Are you familiar with the blow-down pipe that is connected to that boiler?

A Yes.

Q Now, did any IRS employee ever complain to you that that blow-down piping was a safety hazard?

A No.

Q Did any Ogden employee ever inform you that this pipe was a safety hazard?

A No.

Q Would you be the one they would have informed if they felt it was a safety hazard?

A Ogden?

Q Yes.

A Probably not, They would have fixed it themselves.

(Tr. at 303–305).

Further, Albert Palmaccio, the Ogden–Allied Project Manager at the Brookhaven IRS Service Center at Holtsville in May 1993 confirmed the lack of IRS control of the boiler room, as follows:

Q And what were your duties and responsibilities as a project manager at the Holtsville facility?

A I was the on-site project manager for Ogden. I was responsible for overseeing all contractual obligations, responsibility are satisfied—were satisfied.

. . . .

Q And what were the duties and responsibilities of Ogden–Allied at the IRS facility in Holtsville?

A An operation and maintenance contract, responsible for all the utility systems, mechanical systems, electrical, plumbing.

Q Would that include to insure that the premises were maintained in a safe manner?

A Yes, that's correct.

Q And would that include that the boiler room was maintained in a safe manner?

A That's correct.

. . . .

Q Now, could Ogden–Allied have built a step-over over the blow-down piping?

A Yes.

Q Would they have had to have gotten IRS approval to build this?

A No.

Q Now, with regard to the maintenance performed by Ogden, do any IRS employees ever physically perform the labor related to the maintenance with Ogden employees?

A No.

Q Did any IRS employees ever supervise Ogden employees as they performed their maintenance functions?

A No.

Q Did any IRS employees ever direct any IRS employee—any Ogden employee as they performed the maintenance?

A No.

. . . .

Q And Ogden–Allied had their own equipment at the facility?

A  Yes, we did.

(Tr. at 326–326, 335).

The plaintiff has a further burden in this case because not only is he an employee of the contractor, but, during his tour of duty, he is *the* employee charged with the duty to inspect and maintain this very boiler room and its appurtenances.  In *Flynn v. United States,* 631 F.2d 678 (10th Cir.1980), the plaintiff was employed by a government contractor and was injured while on the job doing work for the contractor at an Air Force Base.  It was held that there was no liability on the part of the Government on the ground "the United States was not liable for injuries to an employee of an independent contractor.  The general right to inspect and make safety requirements is not enough.  Control requires such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way."  This language in *Flynn* is also significant:

Control requires "such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way."  [Restatement 2d Torts, § 414, Comment C].

. . . .

FTCA in its definition of "employee" says, 28 U.S.C. § 2671, that the term "does not include any contractor with the United States."  *United States v. Orleans,* 425 U.S. 807, 96 S.Ct. 1971, 48 L.Ed.2d 390, in considering an FTCA claim said:

"A critical element in distinguishing an agency from a contractor is the power of the Federal Government 'to control the physical performance of the contractor.'  *Logue v. United States,* 412 U.S. 521, 528, [93 S.Ct. 2215, 2219, 37 L.Ed.2d 121] (1973)."

. . . .

Restatement § 413, relating to the duty of an employer to take precautions against dangers involved in work entrusted to a contractor, is not applicable because the contract in the instant case required the contractor to take the necessary precautions.

. . . .

The cause of the injury was the negligence of Dynalectron, the employer of the plaintiff.

. . . .

The FTCA does not permit recovery in the case at bar.  Dynalectron was not an employee of the United States and did the work in its own way.  The United States did not control the details of performance.  The negligence of Dynalectron caused the accident.  Recovery from the United States may not be had under any theory of absolute liability.

*Id.* at 680–682.

Also, in *Crippen v. Nelson Realty,* 572 F.Supp. 87 (E.D.N.Y.1983) the Court held:

The standard for differentiating between an employee and an independent contractor under the FTCA is whether the government retains authority to control the day-to-day detailed physical performance of the work.  *Logue v. United States,* 412 U.S. 521, 527–28, 93 S.Ct. 2215, 2219–2220, 37 L.Ed.2d 121 (1973).  The government can require compliance with federal standards and contract specifications without being deemed to have day-to-day control.  *United States v. Orleans,* 425 U.S. 807, 815–16, 96 S.Ct. 1971, 1976–1977, 48 L.Ed.2d 390 (1976); *Brooks v. A.R. & S. Enterprises, Inc.,* 622 F.2d 8, 11 (1st Cir. 1980); *Alexander v. United States,* 605 F.2d 828, 832–34 (5th Cir.1979).

In *Reany v. United States of America,* 738 F.Supp. 680 (E.D.N.Y.1990), the plaintiff's arm was burned by steam emanating from a pipe at the Brookhaven Laboratory.  Although the Brookhaven Laboratory was owned by the United States, it was operated by an independent contractor.  Even though the United States Department of Energy retained the right to impose minimum safety requirements, it was not liable for the acts of an independent contractor who operated the Laboratory.

■ Moreover, neither the retention of the right to inspect the contractor's work, nor the power to control a contractor's compliance with the contract's specifications, is sufficient to convert the contractor's status from an independent contractor to an agent of the

Government for the purposes of this Act. In *Jennings v. United States of America*, 530 F.Supp. 40, 43, 44 (D.D.C.1981), the rule was clearly set forth:

> The Government's retention of an ability to inspect GHC's work is insufficient to shift GHC's status from an independent contractor to a servant or agent.
>
> . . . .
>
> Moreover, many courts have permitted the government to exercise greater supervisory powers over the contractor than in the instant case without altering the contractor's legal status from an independent contractor to an agent or servant. For example, in *Alexander v. United States*, 605 F.2d 828 (5th Cir.1979), the Fifth Circuit rejected plaintiff's claim that the authority the Government exercised under its safety program at an ammunition plant constituted day-to-day supervision of its contractor. *Id.* at 834. Rather, the court reasoned that the Government's supervision was "only a means of monitoring compliance with the contract and with government safety regulations." *Id.* In addition, the Tenth Circuit has reasoned that "[t]he fact that the contract may have reserved to the United States the right to inspect the work and facilities of the independent contractor, and the right to stop the work, does not in itself override or alter the general rule of nonliability for the torts of the contractor." *United States v. Page*, 350 F.2d 28, 31 (10th Cir.1965), *cert. denied*, 382 U.S. 979, 86 S.Ct. 552, 15 L.Ed.2d 470 (1966).
>
> Because the Government usually receives a right of general supervision in contracts with private parties in order to ensure that the contract obligations are being met, *see Harris v. Pettibone Corp.*, 488 F.Supp. 1129, 1135 (D.Tenn.1980); *Kropp v. Douglas Aircraft Co.*, 329 F.Supp. 447, 468–69 (E.D.N.Y.1971), "the fact of broad, supervisory control or even the potential to exercise even detailed control, cannot convert a contractor into an agent." *Gibson v. United States*, 567, F.2d 1237, 1242 (3d Cir. 1977), *cert. denied*, 436 U.S. 925, 98 S.Ct. 2819, 56 L.Ed.2d 768 (1978). Thus, many federal courts have "consistently held that

the United States cannot be vicariously liable for injuries to workmen on Government construction sites, solely because the Government has retained control over the work and safety practices of the independent contractor whose negligence caused the injury." *Id.* at 1243.

See also *Lipka v. United States of America*, 369 F.2d 288, 291 (2d Cir.1966) *cert. denied* 387 U.S. 935, 87 S.Ct. 2061, 18 L.Ed.2d 997 (1967) (the reservation of power to control a contractor's compliance with the contract's specifications does not make the contractor an employee or agent); *De Blasio v. United States of America*, 617 F.Supp. 1004 (E.D.N.Y.1985) (a critical element is the power to control the detailed physical performance of the contractor).

Accordingly, for the reasons stated above, the Court finds that Ogden–Allied was an independent contractor at all the times at issue in this case. Thus, the defendant United States of America is not liable for the negligent conduct of Ogden–Allied with regard to the maintenance of the blow-down pipes in the boiler room.

### III. Did the Plaintiff Prove that the IRS was "Independently" Negligent?

The plaintiff contends that, even assuming that Ogden–Allied was an independent contractor and the IRS could not be responsible for the negligent conduct of Ogden–Allied, that the IRS was "independently" negligent. This alleged negligence is based on the theory that the IRS was the tenant of the boiler room premises and had an independent "duty" to remedy a known dangerous condition, namely the blow-down pipes along the floor in the boiler room. The Court disagrees.

A review of the evidence in this case reveals that the plaintiff failed to prove any "independent" liability on the part of the IRS for two reasons. First the plaintiff failed to prove that the IRS, as the tenant, had a duty to ensure that an independent contractor performs its work in a safe manner. Nor did the plaintiff prove that the IRS, as tenant, had a duty to protect O'Neill, the contractor's employee, from a hazard that is incidental to

or part of the work that O'Neill and the independent contractor are hired to do. See, e.g., *Levrie v. Department of Army*, 810 F.2d 1311 (5th Cir.1987). Perhaps if the IRS exercised control over or interfered with the contractor's performance of its work, the tenant would have a duty to exercise reasonable care in supervising the contractor's activity. However, in this case, the Court finds that the IRS did not exercise such control over the work of Ogden–Allied.

▇ Second, the Court finds that, under the circumstances of this case, the IRS did not have a duty to O'Neill to maintain the blow-down pipes in a reasonably safe condition. Under New York law, the question of whether IRS owed a duty to O'Neill, as an employee of Ogden–Allied, is a question of law. See *Purdy v. Public Administrator of County of Westchester*, 72 N.Y.2d 1, 8, 530 N.Y.S.2d 513, 516, 526 N.E.2d 4, 8 (1988); *Eiseman v. State of New York*, 70 N.Y.2d 175, 187, 518 N.Y.S.2d 608, 511 N.E.2d 1128 (1987); *Bartoloni v. Rapisarda*, 202 A.D.2d 463, 609 N.Y.S.2d 47 (2d Dep't 1994).

In the determination of whether there should be a "duty" on the part of the IRS to protect O'Neill with regard to the blow-down pipes on the boiler room floor, the main consideration is one of sound public policy. It is "the responsibility of the courts, in fixing the orbit of duty to limit the legal consequences of wrongs to a controllable degree ..." *Eaves Brooks Costume Company, Inc. v. Y.B.H. Realty Corp.*, 76 N.Y.2d 220, 557 N.Y.S.2d 286, 289, 556 N.E.2d 1093, 1096 (1990). Indeed, in fixing the bounds of a legal duty logic, common sense and public policy all play an important role. *De Angelis v. Lutheran Medical Center*, 58 N.Y.2d 1053, 1055, 462 N.Y.S.2d 626, 449 N.E.2d 406 (1983); *Parks v. Hutchins*, 162 A.D.2d 666, 557 N.Y.S.2d 389, 393 (2d Dep't 1990).

In this regard, the Court agrees with the closing argument of the Assistant United States Attorney that it would be ironic and illogical to permit the plaintiff to recover for tripping on a pipe that he had the duty to safeguard, and was known by him to be dangerous as a result of his previously falling over the same pipe five or six times. On the contrary, the Court finds that in this factual scenario the sole duty to maintain the blow-down pipes in a reasonably safe condition was on Ogden–Allied and O'Neill.

▇ In addition, under the facts in this case, the plaintiff is confronted with another obstacle. Even if the Court were to find an independent duty on the part of the IRS to maintain the blow-down pipes in a reasonably safe condition, there are a series of cases in New York that enunciate the rule that there is no duty to warn of a known condition that is in plain view and can be readily observed by the use of one's senses. See *Bombard v. Central Hudson Gas and Elec. Co.*, 205 A.D.2d 1018, 614 N.Y.S.2d 577 (3d Dep't 1994) (electric company not liable for injuries sustained by plaintiff electrocuted by powerline where plaintiff saw wires and knew they were there); *Zaffiris v. O'Loughlin*, 184 A.D.2d 696, 585 N.Y.S.2d 94, 95 (2d Dep't 1992) (defendant not liable for failing to warn plaintiff who fell through floor because room was well lit and condition of floor should have been readily observed); *Brown v. New York Medical College for Comprehensive Health Practice*, 162 A.D.2d 139, 556 N.Y.S.2d 84, 85 (1st Dep't 1990) (plaintiff should have noticed whether chair had a back, arms or wheels before trying to sit on it); *Powers v. Montgomery Ward & Co.*, 251 A.D. 120, 295 N.Y.S. 712 (4th Dep't), *aff'd*, 276 N.Y. 600, 12 N.E.2d 595 (1937) (department store not liable for plaintiff's injuries when she tripped over a display platform in defendant's store, as the condition was "in plain view of any person using his eyes").

The blow-down pipes at issue were in plain view and could be easily seen by the use of one's senses. In addition, the plaintiff knew their location and that they were a potentially dangerous condition. While in a different factual setting, a tenant in possession could be liable for failure to safeguard the pipes as to a visitor with no prior knowledge of the presence of the pipes, here, the plaintiff worked in this boiler room for more than twenty years, fell over the same pipes five or six times and had the duty to maintain and safeguard the boiler room and the very same pipes. There is no independent duty on the part of the tenant IRS to such a participant, as a matter of law.

## IV. *Additional Findings and Conclusions*

1. It was Ogden–Allied, not the defendant or the IRS that, by contract, and in fact, was exclusively responsible for the maintenance of the boiler room and its appurtenances including the blow-down pipes in a reasonably safe condition.

2. As a result of this contractual obligation on the part of Ogden–Allied, it, and not the IRS, had the duty to maintain the blow-down pipes and the boiler room floor, in a reasonably safe condition, as the plaintiff himself conceded:

Q And as you testified a watch engineer is responsible for the operation and maintenance of the power plant.

Focussing on Ogden Allied for a moment now, you would agree, would you not that Ogden Allied was responsible for the maintenance work at the facility?

A Yes.

Q And Ogden Allied, for example, was responsible for maintaining the boiler room?

A Yes.

Q And you would agree that Ogden Allied was exclusively responsible for housekeeping chores in the boiler room?

A Yes.

Q For example, Ogden was responsible for insuring that the boiler room was cleaned and mopped, that seals on the pumps were checked, that there were no leaks in the engines; is that correct?

A Yes, sir.

Q And that was done to insure that the boiler room was maintained in a safe manner; is that correct?

A Yes.

Q And Ogden would be responsible for doing the checks on an hourly basis; is that correct?

A Yes, when possible.

Q When all of these things are done, the items are checked, there is no IRS employee checking these items along with Ogden Allied; is that correct?

A Correct.

Q There is no IRS employee directing the Ogden employee doing these checks?

A Correct.

Q On how to do the checks; is that correct?

A Yes, sir, correct.

Q If an Ogden Allied employee came across a problem, say, for example, a leak, the Ogden employee could fix the leak without checking or involving the IRS; is that correct?

A Yes. It would only require the hand tools.

Q If a correction or modification needed to be made, Ogden had these in stock to make these corrections and modifications, had the tools to make this?

A Yes, some, yes.

Q And Ogden Allied does have equipment in stock to make modifications if necessary?

A Some. Mostly in the plumbing line and engines.

Q Ogden has some of its own equipment at the facility?

A Yes, sir.

Q And Ogden used its equipment for maintenance purposes; is that correct?

A Yes.

Q There was no IRS employee stations in the control room who observed Ogden Allied; is that correct?

A Yes.

Q And at the time the Ogden Allied employee was going about his general maintenance tasks, there was no IRS employee directing them how to perform the tasks; is that correct?

A Not normally.

Q Now, Mr. O'Neill, you were employed as a watch engineer from 1972 to 1993; is that correct?

A Yes, sir.

Q And you were employed for a period of at least 21 years at the IRS facility; is the correct?

A Yes, sir.

Q And the watch engineer is responsible for running the total energy plant?

A Correct.

**610**

. . . .

Q For example, one of the things in a total energy plan is a boiler room?

A Yes.

Q And a watch engineer is responsible for running the boiler room?

A Yes.

Q And a watch engineer is responsible for insuring that equipment within the boiler room is functioning properly?

A Yes.

Q And the total energy plant is maintained in a safe working condition?

A Yes.

Q And it is the responsibility of a watch engineer to check the boiler room on an hourly basis; isn't that correct?

A Yes, when possible.

Q And you would agree with me that that is one of the responsibilities that are provided—that are required, rather, of a watch engineer, to check the boiler room on an hourly basis?

A Hourly basis, yes, when possible.

Q Was it your understanding when you came to work, as you did for many years, to perform your duties as a watch engineer, that one of those duties was to check the boiler room on an hourly basis?

A Yes, when possible.

Q So, in a given shift, would it be fair to say that you would average checking the boiler room at least eight times a day?

A Approximately, yes, sir.

(Tr. 44–50).

3. In particular, the plaintiff, as a watch engineer had the duty to inspect and maintain the boiler floor and the blow-down pipes in a reasonably safe condition.

4. The Court finds the plaintiff failed to prove that the "lighting" in the boiler room in any way contributed to the happening of this occurrence.

5. The plaintiff's fall over the blow-down pipes on May 5, 1993, and the injuries sustained by the plaintiff, whatever their nature and extent, were caused solely by the negligence of Ogden–Allied and, at least in part, by the plaintiff himself.

6. Under the provisions of the FTCA, there was no duty on the part of the IRS or the United States to maintain the boiler floor and the blow-down pipes in a reasonably safe condition with regard to the plaintiff, the employee of Ogden–Allied, who was in charge of the maintenance of that area.

7. The negligent conduct in this case, with regard to the maintenance of the boiler room floor and the blow-down pipes was the sole responsibility of the independent contractor Ogden–Allied.

8. The provisions of the FTCA clearly enunciate that the United States cannot be liable for the acts or omissions of an independent contractor such as Ogden–Allied.

9. There was no independent duty on the part of the IRS to the plaintiff O'Neill to safeguard the boiler room blow-down pipes.

Accordingly, for the reasons stated, the Court directs the Clerk to enter a judgment in favor of the defendant United States of America, dismissing the complaint.